Anna E. AQUINO

v.

Patricia Roberts HARRIS, Secretary of Health and Human Services.

Civ. A. No. 80–1400.

United States District Court, E. D. Pennsylvania.

April 17, 1981.

Michael Rakoski, Green & Lundgren, A Professional Corp., Haddonfield, N. J., Doris Dabrowski, Tabas & Furlough, Philadelphia, Pa., for plaintiff.

James G. Sheehan, Asst. U. S. Atty., Dept. of Health and Human Services, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

GILES, District Judge.

Anna Aquino, a widow and claimant, asserts entitlement to widow's insurance benefits under 42 U.S.C. § 402(e)(1)(B) (1976).[1] Claimant contends that she is above the age of fifty, but not yet 60, and the disabled widow of an individual who died fully insured.[2] This court has jurisdiction under 42 U.S.C. 405(g) (1976).

---

1. § 402 reads in pertinent part:

(e)(1) The widow (as defined in section 416(c) of this title) ... of an individual who died a fully insured individual, if such widow

(B) ... (ii) has attained age 50 but has not attained age 60 and under a disability (as defined in section 423(d) of this title) ... shall be entitled to a widow's insurance benefit

 . . . . .

2. Section 423 provides in pertinent part:

(d)(1) The term "disability" means—

(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months;

 . . . . .

(3) For purposes of this subsection, a "physical or mental impairment" is an im-

On November 15, 1978 the Secretary denied claimant's application for widow's insurance benefits. Tr. 56–57. The Secretary subsequently denied request for reconsideration, Tr. 58–59. The Administrative Law Judge (ALJ) and Appeals Council affirmed Tr. 3, and Tr. 7–12, respectively. For the reasons following, we remand.

Plaintiff has demonstrated by competent medical evidence, a report of Marvin E. Sultz, D.O., a treating doctor, that she cannot engage in her former employment as a waitress. (Record, Exhibit 16). In denying her claim, the Administrative Law Judge ("ALJ") relied upon a report of a consultative examination conducted by Thomas P. Obade, M.D., an orthopedic surgery specialist. (Record, Exhibit 12). Dr. Obade opined that plaintiff is a candidate *only* for a sedentary type of employment, *if* such is available to her within her level of education and training. Tr. 90. His examination by x-ray revealed pointing of the tibial spines of the knees and mild to moderate degenerative changes in the thoracic and lumbosacral spine manifested by spurring of the lumbar vertebral and dorsal vertebral bodies. He diagnosed dorsal and lumbar spondylosis and arthralgias of the knees and possible early degenerative joint disease of the knees. Based on his physical findings, Dr. Obade concluded that plaintiff is disabled from performing work that requires vigorous physical activity. Although the ALJ relied completely upon Dr. Obade's report, it is apparent upon reading it that he saw her only once and did not discount plaintiff's complaints of disabling pain in rendering his opinion. He noted at the beginning of his report that:

> The patient has a several year history of pain in the low back and dorsal spine area. She has no neurological symptoms of the extremities. She does have chronic pain diffusely about both knees. She is being treated by her family physician, Dr.

Pellegrino, apparently with Ascripton. This seems to relieve her symptoms somewhat.

Tr. 89. This statement must be read as deferring to the treating physician's, diagnosis and treatment of the pain symptomatology. At no point in his report does Dr. Obade conclude that his physical findings by x-ray are not consistent with disabling pain.

Plaintiff was hospitalized in May, 1977, being admitted through the emergency room of West Jersey Hospital, where she had gone on her own, after complaints of two months of chronic severe right flank and right upper quadrant pain. (Record, Exhibit 8). All possible explanations for the pain were objectively excluded except that marked degenerative changes in her dorsal and lumbar spine were clearly implicated. She had persistent pain throughout the ten days hospitalization period and was discharged before she recovered because she had received the maximum hospital course of treatment. Chronic pain on discharge is corroborated by Dr. Pellegrino's prescription of Tylenol # 3, a very strong pain-killer.

Incomprehensibly, and improperly, the ALJ attempts to discredit Dr. Pellegrino's report of his hospital diagnosis of severe degenerative arthritis of D8 through D12 and L1 (Record, Exhibit 17) by stating:

> While he implies her admission as due to severe degenerative arthritis from T8 down to L1 (Exhibit 11), the hospital record (Exhibit 8) shows her stay, which was from May 31, 1977 to June 10, 1977, was due to 'severe right flank pain.' The examinations did reveal severe (or marked) degenerative changes of the dorsal spine at L–1. X-rays also showed minimal changes at L4. She was discharged by Dr. Pellegrino on Tylenol # 3 after treatment which included a thorough examination, compresses and muscle relax-

pairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

Section 416(c) defines widow as follows:

The term "widow" . . . means the surviving wife of an individual, but only if . . . she was married to him for a period of not less than nine months immediately prior to the day on which he died. . .

ants (Exhibit 8, page 1). The attorney brought to the hearing a letter he secured from the physician stating 'At that time a diagnosis of severe degenerative arthritis of D8 through D12 and L1 was made' for which he prescribed Ascripton (Exhibit 17). It is noted that Dr. Pellegrino's diagnosis does not agree with that of Dr. Steel who read the x-ray films nor his own discharge diagnosis (Exhibit 8 pages 1 and 6).

Tr. at 10.

First, this discussion overlooks the fact that Dr. Pellegrino did not admit her. She went to the hospital emergency service on her own and only thereafter came onto his service. (Tr. 76). While the ALJ states that Dr. Pellegrino's diagnosis does not agree with that of the West Jersey Hospital radiologist, R. C. Steel, M.D., however, the ALJ fails to state in what respect the x-ray readings differ. Dr. Steel concluded:

AP and lateral views of the dorsal lumbosacral spine shows no change since the previous study done on 5/11/77. *Again there is evidence of moderately severe hypertrophic changes in the mid to lower dorsal spine although more extensive in the lower dorsal spine.* There are also some hypertrophic changes involving L1 and a minimal amount involving L4. The intervertebral spaces are well maintained and there is no evidence of any spondylolysis or spondylolisthesis. There are no destructive changes. No other significant findings were noted.

CONCLUSION: MODERATELY SEVERE DEGENERATIVE CHANGES INVOLVING THE LOWER DORSAL SPINE INCLUDING L1. MINIMAL DEGENERATIVE CHANGE INVOLVING L4. (Emphasis added).

(Tr. 82).

The record is void of the radiologist's qualifications such that he should be credited over the treating physician, Dr. Pellegrino. For example, it is not known if Dr. Steel is an orthopedic specialist. It is noted that while Dr. Steel concluded there was no radiologic evidence of spondyloysis, Dr. Obade, who was credited by the ALJ, did diagnose

that very condition from x-rays he took. Dr. Steel's report refers to x-rays previously taken for which a report is not included in this record, namely the study done on May 11, 1977.

A close reading of Dr. Steel's report fails to disclose any significant inconsistency with Dr. Pellegrino's diagnosis upon discharge. The discharge summary reflects the conclusion of severe degenerative changes of the dorsal spine including L1. (Record, Exhibit 8).

Incomprehensively, the ALJ concluded that Dr. Pellegrino's letter of July 10, 1979 (Record, Exhibit 17) was inconsistent with his discharge diagnosis of November 26, 1977. Dr. Steel found "moderately severe hypertrophic changes in the mid to lower dorsal spine although more extensive in the lower dorsal spine. This would include L1. Dr. Pellegrino's discharge summary necessarily incorporated by reference the x-rays studies by Dr. Steel.

On July 10, 1979, Dr. Pellegrino was continuing to treat plaintiff on a post-hospitalization basis. That he then may have given a more detailed explanation of the hospital x-ray findings is not a rational basis for a finding or inference by the ALJ either that Dr. Pellegrino was not credible or that his letter was inconsistent with his prior discharge summary or Dr. Steel's report. In fact, Dr. Pellegrino's x-ray readings would appear to agree with Dr. Obade's who also found mild to moderate degenerative changes of the thoracic and lumbosacral spine manifested by spurring of lumbar vertebral and dorsal vertebral bodies. (Record, Exhibit 12, dated March 14, 1979). Dr. Pellegrino's diagnosis was severe or marked degenerative arthritic changes through L1. If the ALJ credited Dr. Obade's x-ray findings over Dr. Pellegrino's it was incumbent upon him to state in what particulars and why the difference was objectively significant. This was not done in this case.

In attempting to discredit Dr. Pellegrino's discharge diagnosis the ALJ subtly implied from Exhibit 17 that the physician had prescribed upon hospital discharge Ascripton instead of Tylenol # 3 as shown by

the hospital record. *Compare* Exhibit 11, discussed *infra*. Upon discharge, Dr. Pellegrino noted, in the category for pertinent physical findings, "Marked tenderness in right upper qudrant (sic) and right flank. *No rebound*." (emphasis added). Under the category, "Disposition," he wrote that she was to be seen in his office two weeks hence. She kept that appointment. On June 22, 1977, Dr. Pellegrino certified that she was totally incapacitated from work. (Record, Exhibit 9). She was seen thereafter every 2 weeks through December 8, 1978. (Record, Exhibit 11). It was not until that time, as evidenced by a letter to a Dr. Wolf dated December 8, 1978 on a DHEW social security form, that he stated that *he was going* to place plaintiff on Ascripton. That December 8, 1978 medical report reads:

"Anna Aquino is a patient of mine from 5–31–78 to the present time. At that time she was admitted to West Jersey Hospital Southern Division with severe degenerative arthritis from T8 down to L1. This has incapacitated her and made her unable to walk or move or do any lifting. Following her discharge from the hospital on 6–10–78 she was seen in the office every two weeks until the present time. She showed minimal to moderate improvement with the use of analgesics over the next year. However, she never regained full use of the back and is constantly in pain.

At present time she has marked degenerative arthritis T8 thru L1 with no relief of symptoms. As a matter of fact the condition is worsening. *I'm putting her on Ascripton and weight loss to try and improve the outlook.* She is presently totally disabled and cannot work. If you have any further questions, please contact me." (Emphasis added).

This makes sense only if read in the context of the subsequent letter of July 10, 1979. It reads:

Enclosed are copies of our records for your use. As you know Mrs. Aquino has been a patient of mine at West Jersey Hospital Southern Division beginning 5–31–77. At that time a diagnosis of severe degenerative arthritis of D8 thru D12 and L1 was made. This had incapacitated her to the point where she could not do any more lifting, straining or any long periods of time on her feet.

She had an elevation of her SED rate which went along with the diagnosis of degenerative arthritis. She was placed on Ascripton which is one of the ideal medicines for degenerative arthritis and had at best a slight improvement. At times she is unable to get out of bed and do any great amount of work. It is my feeling that she is totally incapacitated from degenerative arthritis.

Because the July 10, 1979 letter was not read in the context of the December 8, 1978 report, this court concludes that the ALJ used an irrational basis, and therefore erred, in attempting to discredit Dr. Pellegrino's reports and diagnoses, particularly the July 10, 1979 letter brought to the hearing by plaintiff's counsel.

The evidence shows that plaintiff continued with Dr. Pellegrino for a while but chose another doctor because the medication received was not helping her. (Tr. 33). She came under the care of Marvin E. Suitz, D.O., who prescribed Percodan, a potent pain killer. (Record, Exhibit 18). The medical history of record shows that this medication was given because of severe pain and that treatment was continuing as of the time of the hearing. (*Id.*; 33–35). Although the ALJ acknowledges that Dr. Sultz was prescribing such medication for plaintiff, there was no discussion in the decision as to the nature or effect of the medication which must be taken. The ALJ erred in failing to take into consideration plaintiff's testimony that the ingestion of Percodan makes her drowsy. Dr. Obade did not consider her medication or the effect it would have upon her ability to hold and perform even sedentary work.[3] He did not

---

3. See Tr. 34–35:

Q. But did the doctor write down all of the medications that he prescribed?

A. Yes, right now, yes.

Q. Are you taking all of those medications to your knowledge?

state medically it was unwarranted, so it must be deemed essential for relief from severe pain.

Next, the ALJ erred in rejecting the psychiatric diagnosis made by James D. Nelson, M.D., a Diplomate of the American Board of Psychiatry and Neurology, assertedly because "His diagnoses are not shown as supported by other than his examination and her subjective complaints." First, the ALJ erred in assigning no value to plaintiff's subjective complaints; and next in pretending to be a psychiatrist. He assumed that a physician who specializes in psychiatry and neurology is incompetent to make a diagnosis based on an examination of the patient. Third, he erred in stating that Dr. Nelson considered only his own examination findings. A fair, even cursory, reading of Dr. Nelson's September 14, 1979 report reveals that he took a complete history from the plaintiff, reviewed the hospitalization records from the West Jersey Hospital, the post-hospitalization back treatments by Drs. Pellegrino and Sultz, a history of plaintiff's residual medical problems, and made findings from his own physical examination, including neurological and psychiatric examinations. These "revealed evidence of increased tension manifested by tremors of the outstretched hands, hyperirritability and lowered frustration tolerance." Tr. 111.

It is significant as well that the ALJ did not treat or explain why he was disregarding Dr. Nelson's opinion based upon the medical history and course of treatments, that the severity of plaintiff's condition had only increased, and was still progressing, and that she will never improve significantly. Dr. Obade's physical findings and diagnosis are consistent with those of Dr. Nelson's, yet the ALJ rejected Dr. Nelson's medical opinion without plausible explanation.

Dr. Nelson added that the plaintiff's condition is complicated by an anxiety reaction with depressive features. Based on the medical history, this medical conclusion can hardly be rejected out of hand as the ALJ apparently did. Plaintiff told Dr. Nelson:

"I still get terrible pain and stiffness in my back—the pain is worse in the morning—then my back is so painful and stiff that I have to roll out of the bed—I am unable to take care of my home—My daughter-in-law has to do most of the housework—I can only do some of the lighter chores—I'm not getting any better—Now the joints of my fingers are beginning to hurt and they are sore—." Mrs. Aquino went on to say that she has reacted to the chronic discomfort and limitation in her ability to function with symptoms of anxiety and depression. "I'm nervous all the time—I don't sleep well at night—I'm always feeling miserable—Most of the time life just doesn't seem to be worth living.—".

Tr. 110.

In denying the claim, the ALJ concluded that plaintiff has a variety of *minor* impairments none of which is "singly or in combination of a severity as to equal or be equivalent to any of the listed impairments in Subpart P of the Social Security Regulations No. 4." (Tr. 12). The ALJ's conclusion that plaintiff's back condition, for example, is a "minor" impairment is not supported by any evidence, whatsoever, even Dr. Obade's medical findings. Dr. Obade did not conclude that the physical defects he found on physical examination were not

A. Yes, yes. The little yellow ones I take four times a day and then I have the pressure pill that I take in the morning with orange juice and then I have a pill when I get severe pain. I don't know the name of it that I take and I lay down with that one because it makes me go to sleep.
Q. How long have you been taking this medication that Dr. Selts has provided for you?

A. I can't even say how long. He changes them all the time. I guess about—John died about a year now.
Q. Now when you take the medication, you indicated that one of those medications makes you want to lie down. When you say want to lie down, is that because it makes you sleepy?
A. Yes, it makes me dopey but it kills the pain. The pain sometimes becomes unbearable. Other times, it's just like a toothache.

capable of causing the kind of pain she described as totally disabling.[4]

It can only be concluded on this record that plaintiff's back condition is a serious or significant impairment capable of disabling pain. However, the ALJ never discussed whether, or why, he disbelieved plaintiff's claims that her pain disabled her from performing even sedentary work. The decision states that:

> She stated that while she has a girdle type brace, it is heavy and she cannot sit in it. As to sitting she must use pillows for her back and cannot sit long. It is noted she sat with no observable discomfort throughout the more than 45 minutes she was in the hearing.

The ALJ's statement that the plaintiff sat with no observable discomfort is undercut by the record.

> Q. Now aside from sitting in the car, if you were to sit for a period of time normally in a chair, for example, what would be the longest period of time you would feel comfortable sitting?
> A. I want to get up now. I don't sit long and I don't stand long and I don't sit long. I lay down. I lay on my stomach a lot. Tr. 38.

As to her alleged disabling pain, claimant testified:

> Q. Now you mentioned that you have pain, Mrs. Aquino. Where on your body do you experience pain?
> A. I have the pain at the base of the spine, all on the right side and sometimes it hits me down when I'm walking—down on the right leg and that's the leg that gets tired and numb.
> Q. You say you have numbness. What do you mean when you say numbness?
> A. Well, it gets like pins and needles. It don't last long. Until it circulates, I guess. I don't know how to put it but that's the way I told it to the doctor and told him.
> Q. Now do you have any pain or discomfort in any other parts of your body?

> A. No, not right now I don't—my hands, just my hands but (inaudible) fingers and this finger here I can't bend it, over here.
> Q. Indicating for the record the index finger on your hand?
> A. Yes, starting real crooked. The doctor told me pretty soon it would be up and this here thumb on the right hand—this one is very sore. I can't turn that.
> Q. Do you have any difficulty grasping objects?
> A. I can't hold onto objects. I do dishes and break them all the time.
> Q. Can you hold a pen, for example, and write clearly with it?
> A. No, I can't sign my name.

\* \* \* \* \* \*

Tr. 36.

Furthermore, neither the ALJ nor Dr. Obade discussed the physician prescribed brace and its effect on plaintiff's ability to work. Plaintiff testified that the brace has two iron bars that run up the spine area; that she wears it for support of her lower back because it relieves her a bit; that it gets so heavy that her legs give out on her; and that she can't sit down with it on. (Tr. 39).

We are then left with the question of whether the ALJ decided that plaintiff's complaints of disabling pain were incredible and, if so, whether he articulated a reasonable basis for disbelieving plaintiff.

The Third Circuit has held that pain may be disabling and that subjective complaints of pain must be given serious consideration even when such complaints are not supported by objective evidence. *Smith v. Califano*, 637 F.2d 968 at 972 (3d Cir. 1981); *Smith v. Harris*, 644 F.2d 985 (3d Cir. 1981). *See also Cancel v. Harris*, 512 F.Supp. 69 at 74 (E.D.Pa.1981). The ALJ's rejection of claimant's complaints of pain without giving reasons makes it impossible for the court to ascertain whether the ALJ gave

---

4. It is noted that the vocational assessment sheet instructs that it be filled out without regard to the applicant's opinion or subjective complaints. Therefore, it cannot be given any dispositive weight at this review level. This court must decide if the Secretary adequately considered the claimant's subjective complaints.

the complaints serious consideration and carefully evaluated all the relevant evidence regarding pain. An ALJ's findings:

"should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which ultimate factual conclusions are based, so that a reviewing court may know the basis for the decision. This is necessary so that the court may properly exercise its responsibility under 42 U.S.C. § 405(g) to determine if the Secretary's decision is supported by substantial evidence."

*Baerga v. Richardson,* 500 F.2d 309, 312 (3d Cir. 1974), cited with approval in *Cotter v. Harris,* 642 F.2d 700 at 705 (3d Cir. 1981).

■ Given conflicts in medical evidence the ALJ has to decide and support any decision with reasons. *Cotter v. Harris, supra,* at 705. The ALJ is not expected to give a medical or scientific analysis far beyond the capability of a non-scientist. *Id.* However, the ALJ must analyze all the evidence and sufficiently explain the weight he gives to probative exhibits and documents; otherwise, "to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Id.* at 705.

■ The decision contains no finding that the ALJ found plaintiff incredible. An ALJ has a duty to state whether or not he credits the subjective complaints of pain. *Smith v. Califano; supra.*

Here, the ALJ stated

"At her hearing Mrs. Aquino made a nice appearance well dressed and groomed, wearing make up, eye liner and well tended nails. No problem in sitting, comprehension or expression was noted."

■ The unstated inference is that plaintiff groomed herself on the day of the hearing. Such an inference overlooks the fact that her daughter-in-law and son live with her so she will not be alone. (Tr. 27). Given plaintiff's testimony that she cannot use her fingers without great pain and difficulty, (for example, she can't sign her name), from the evidence it is plausible that her daughter-in-law assisted her in dressing or grooming for the hearing. Tr. 38, 110. The ALJ's statement that she was having no problems sitting is contradicted by the plaintiff's testimony that she wanted to get up even as she was being questioned at the hearing. *Id.* at 38. There is no evidence that the plaintiff had any choice but to attend the hearing and to sit on whatever chair was made available by the ALJ. Where no medical doctor has questioned her symptomatology and all medical findings are consistent with those productive of disabling pain, the ALJ cannot be permitted to ignore such evidence and reach a conclusion based upon mere observation that plaintiff had no discomfort at that hearing or that she would have no discomfort if she had to sit for a period in excess of 45 minutes.[5] *See Smith v. Califano, supra; Smith v. Harris, supra.* While credibility determinations must be left to the sound discretion of the ALJ, he must make specific findings and, in any event, he cannot, as here, substitute his personal judgment for medical evidence. *Rossi v. Califano,* 602 F.2d 55, 57–58 (3d Cir. 1979); *Eiden v. Secretary of H.E.W.,* 616 F.2d 63, 65 (2d Cir. 1980). He cannot be left to make himself an independent physician.

■ The ALJ relies on an opinion of a physician designated by the Secretary for the conclusion that plaintiff is not disabled from performing sedentary employment. His reliance is misplaced for several reasons, among them the absence of any medical evidence to rebut the competent evidence that she has a significant psychological problem which complicates her physical limitations. *Cf. Summers v. Harris,* 513 F.Supp. 115 (E.D.Pa.1981) (Court remanded for determination of existence of disabling

---

5. While plaintiff said she can drive a car, she testified that she cannot drive a long time and uses her car only for going to a nearby grocery store. Tr. 37. She shops only at the grocery store but cannot carry a full bag. She puts two or three items in a bag, even if it means putting fifteen bags in a grocery cart at a time. (*Id.*)

pain where ALJ also failed to consider claimant's related "significant functional overlay.") At 119. However, Dr. Obade's opinion does not take into consideration plaintiff's medication requirements, her back brace or the effects of wearing the brace. Dr. Obade does not discount the existence of alleged disabling pain.

 A claimant satisfies her initial burden of proving entitlement to disability benefits by having her treating physician substantiate the subjective claims. *Livingston v. Califano*, 614 F.2d 342, 345 (3d Cir. 1980); *Rossi v. Califano*, 602 F.2d 55, 57 (3d Cir. 1979). The ALJ is not bound to accept the conclusion of claimant's physician without weighing it against other relevant evidence. *Urgolites v. Finch*, 316 F.Supp. 1168 (W.D.Pa.1970). An ALJ must resolve contradictory medical evidence and give reasons for accepting or rejecting such evidence. *Cotter v. Harris*, 704–707 (3d Cir. filed February 20, 1981). If no contradictory evidence exists, the ALJ is bound by the expert opinions of claimant's treating physician regarding the existence of the disability. *Rossi v. Califano*, 602 F.2d at 57–58; *Eiden v. Secretary of H.E.W.*, 616 F.2d 63, 64 (2d Cir. 1980); *McLaughlin v. Secretary of H.E.W.*, 612 F.2d 701, 705 (2d Cir. 1980). *See also, Clark v. Harris*, No. 80–2132 slip op. at 6 (E.D.Pa. filed Apr. 7, 1981). In the instant case, claimant has demonstrated by the competent medical evidence of her treating physicians that she is disabled from performing her last held job as a waitress. Tr. 88, 102, 111. Additionally, she testified she cannot hold dishes. Tr. 36. Under such circumstances, the burden shifts to the Secretary to show that she can perform specific jobs in the national economy. *Livingston v. Califano*, 614 F.2d at 345; *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). *And see*, 42 U.S.C. § 423(d)(2)(A) (1974). The ALJ has not made specific findings as to available sedentary work. This court must not speculate as to his findings.

For all of the above reasons, this matter shall be remanded to the Secretary for prompt proceedings consistent with this opinion.