Willie L. MARTIN, Plaintiff,

v.

Richard S. SCHWEIKER, Secretary of
Health and Human Services,
Defendant.

Civ. A. No. 80-1423.

United States District Court,
D. Kansas.

Jan. 7, 1982.

**913**

Marilyn Harp, Legal Aid Society of Wichita, Wichita, Kan., for plaintiff.

James P. Buchele, U.S. Atty., Wichita, Kan., for defendant.

## ORDER DENYING MOTION FOR SUMMARY JUDGMENT AND REMANDING CASE FOR FURTHER HEARING

THEIS, District Judge.

This action has been brought pursuant to 42 U.S.C. § 405(g) for judicial review of a final decision of the Secretary of Health and Human Services. Defendant seeks summary judgment and plaintiff seeks reversal of the Secretary's decision.

Plaintiff filed an appeal for disability insurance on October 20, 1978. His claim was denied. On August 2, 1979, plaintiff filed an application for supplementary security income disability benefits. At plaintiff's request, a hearing was held on November 26, 1979. On December 26, 1979, the Administrative Law Judge (ALJ) ruled against plaintiff, finding him not under a "disability" as defined in the Social Security Act, and thus not entitled to disability insurance benefits or supplemental security income. On March 31, 1980, the Appeals Council of the Social Security Administration affirmed the hearing decision of the ALJ, which now stands as the final decision of the Secretary.

Plaintiff alleges he became unable to work on August 16, 1978. At that time he had been employed as a packing house laborer for two years. Prior to that he had worked as a construction laborer, filling station attendant, truck driver and yard man. Tr. 36–39.

Plaintiff was born June 23, 1943. His medical history shows that he was admitted to St. Francis Hospital in Wichita, Kansas, on August 29, 1977, complaining of chest pains. At that time plaintiff's medical history indicated recurring chest pains, but on two previous occasions medical examinations had been negative. The medical history also revealed acute onset diabetes mellitus and high blood pressure. Tr. 107. After physical examination, myocardial infarction was ruled out. Tr. 110. After a cardiac catheterization on August 30, 1977, Dr. Joseph Galachia, an internist and cardiologist, concluded that there was questionable dysfunction of the apex of the left ventricle and normal coronary arteries with dominant left circulation. Tr. 118. Plaintiff was discharged from the hospital on August 31, 1977, in improved condition. Tr. 106.

Plaintiff was again admitted to St. Francis Hospital on August 22, 1978, complaining of being tired and rundown for the previous three weeks and of dizzy spells. After a physical examination, the impression of Dr. Feary was diabetes and hypertension by history. Tr. 126. A lumbar spine x-ray revealed minimal degenerative changes in the low dorsal area. Plaintiff was examined by Dr. Bernard Poole, an orthopedic surgeon, on August 26, 1978. His impression was Sprengel's deformity of the left shoulder and mild back sprain. An examination by Dr. Schlicher on August 29, 1978, resulted in a diagnoses of chronic tinea pedis (athlete's foot). Tr. 133. Plaintiff was discharged on August 29, 1978, in an improved condition. Tr. 123.

On September 13, 1978, plaintiff returned to St. Francis Hospital, complaining of back pain, with radiating pain into the right leg, following a slip and fall at work. After physical examination, Dr. Poole's diagnosis was back pain probably secondary to acute strain. Tr. 138. Chest x-rays taken on September 13, 1978, revealed no lesions in the pulmonary fields and the heart was within normal limits. Lumbar spine x-rays revealed minimal degenerative changes in the low dorsal region but no narrowed in-

terspaces. Tr. 139. Dr. Galachia examined plaintiff on September 14, 1978, and determined that plaintiff had no cardiovascular disease. Tr. 144. On September 21, 1978, plaintiff was discharged with instructions to diet and to continue taking insulin. Final diagnoses were back pain secondary to acute strain and diabetes mellitus. Tr. 135–136.

Medical records from the Wichita Clinic indicate that on September 29, 1978, plaintiff's blood sugar may have been high and an increase in insulin dosage was indicated. On October 9, 1978, plaintiff was again examined at the Clinic and continued to complain of back pain. Tr. 140. On November 17, 1978, Dr. Poole submitted a medical report which stated that x-rays showed mild lumbar degenerative changes. Mild paravertebral muscle spasms were also present. Plaintiff was limited to lifting ten pounds or less and limited to standing and walking one to two hours in an eight-hour day. Dr. Poole concluded:

"This patient is not responding well to conservative treatment. There is an increasing suspicion that he is developing progressive nerve root impingement and may well come to surgery. He's not fit for work at this time." Tr. 169.

On November 21, 1978, plaintiff was admitted to St. Joseph Medical Center, complaining of back pain and numbness in his right leg and foot. Dr. Poole's impression was diabetes and chronic low back pain. Tr. 150–152. Dr. D.H. Abbas conducted a neurological examination of plaintiff on November 22, 1978, and his impression was lumbosacral strain, much psychological overlay, and no clinical evidence of disc. Tr. 158. Dr. A. Siegal examined plaintiff on November 22, 1978, and his impression was that plaintiff had probable chronic back strain and is a known diabetic and obese. Tr. 159.

On December 1, 1978, Dr. Sam Harrell conducted a psychological evaluation of plaintiff and stated that he was led to believe plaintiff suffered from anxiety attacks. Tr. 154. On December 4, 1978, Dr. Alan Heap also conducted a psychological examination of plaintiff and found no hallucination or delusional thinking and above average intelligence. Plaintiff's prevailing mood was one of depression. Dr. Heap's clinical impression was chronic pain and possible psychosomatic pain. Tr. 155–157.

On December 1, 1978, Dr. Siegal performed an electromyogram (EMG) on plaintiff's right paraspinal muscles in the right lower extremity. He found a small number of positive waves but no fibrillations and evidence of a mild neuropathy, but no localizing lesion. Nerve conduction studies showed a mild neuropathy of the right tibial nerve. Tr. 160.

In a report dated January 10, 1979, Dr. Galachia diagnosed marked obesity, diabetes mellitus, insulin dependent, and back pain of uncertain etiology, not related to coronary artery disease. Dr. Galachia stated that plaintiff has a lot of psychological problems and that "his cardiovascular complaints are not disabling at this time." He stated:

"I feel that his prognosis for life is good and I feel his prognosis for working would be extremely good given the right setting and given the right attitude on his part. I do not feel he is disabled for any kind of labor, and feel that he should return to full activity." Tr. 170.

Dr. Galachia's opinion was immediately qualified, however, as he noted that he would not comment on plaintiff's musculoskeletal complaints and that any evaluation of those complaints should be made by the orthopedic surgeon treating the plaintiff. Tr. 170.

Dr. R. Lawrence Sifford, an internist and cardiologist, examined plaintiff on January 13, 1979. In his report Dr. Sifford concluded:

"This man obviously has diabetes mellitus, although it seems to be under fair control, but certainly not as good as one would like. He is obese. He obviously has significant emotional overlay. His major difficulty, however, is pain in his leg and back. I would feel this man is not disabled with the exception of whatever disability an orthopedist would give

him. He probably should not do certain kinds of heavy work such as lifting and bending, although in a man who has such a tremendous emotional overlay it would be extremely difficult for anyone to ascertain what part of his difficulty is organic and what part is emotional. He may or may not have ruptured discs and he may or may not have chronic muscle spasm and ligamentous strain. He clearly does have severe anxiety, and severe depression and this modifies his symptomatology remarkably. However, I find no disability in this man outside of whatever disability an orthopedist would give him. He feels his exclusive problem, which would keep him from working, would be his back and leg, and I feel an orthopedic opinion would be necessary to ascertain this. Outside of the orthopedic problem, I find no physical difficulty that would disable him." Tr. 173.

On January 29, 1979, plaintiff was admitted to St. Joseph Medical Center. The impression of the examining physician, Dr. M. Patton, was chronic low back pain, diabetes mellitus and acid fact bacillus recovered from spinal fluid. Tr. 161–162. On January 24, 1979, lumbar spine x-rays and a lumbar myelogram were negative. Tr. 181.

Plaintiff was discharged from the hospital on February 2, 1979. In a final progress note, Dr. E. David Kirk, an internist, noted that there was no question about a positive response to plaintiff's tuberculosis skin test. Tr. 178.

In a report dated April 23, 1979, Dr. Kirk indicated that despite the spinal fluid indicia and the tuberculosis skin test, radiational studies failed to reveal bone or joint tuberculosis. He concluded:

"In retrospect, it appears that this man has possibly a diabetic neuropathy of the right lower extremity. Presently he is ambulatory, he remains somewhat obese, and has limited back function and much pain in the back and the right leg on activity. He is afebrile and his diabetes has been maintained and reasonably well controlled." Tr. 185.

A consultative examination was performed by Dr. Ruperto Mendiones, an internist, on May 29, 1979. He concluded that plaintiff had chronic low back pain, uncertain etiology, and that plaintiff's complaints appeared to exceed the findings of physical examination. Tr. 186. Chest x-rays and an electrocardiogram taken on May 29, 1979, were normal. Tr. 189.

On June 3, 1979, Dr. Thomas Luellen submitted a report concerning only his treatment of plaintiff's diabetes. While Dr. Luellen specifically stated that an orthopedic doctor should give the opinion on plaintiff's back, he opined that plaintiff's overweight would accentuate any musculoskeletal problems. As to plaintiff's diabetes, the prognosis was very poor. Dr. Luellen stated that plaintiff's obesity is not in itself enough to keep him from working.

On June 5, 1979, Dr. Kirk, who had been plaintiff's treating physician since January 25, 1979, submitted a report stating:

"The present treatment is mainly management of a diabetic neuropathy which consists of injections and oral medication. The prognosis is guarded, that is, sometimes diabetic neuropathy can improve substantially and almost attain complete recovery. On the other hand, the prognosis could be very poor with minimal or no recovery. In my opinion he cannot engage in any gainful activity." Tr. 208.

On November 19, 1979, Bill Moore, a Vocational Rehabilitation Counselor for the State of Kansas, submitted a report in which he stated that plaintiff's file was closed at the State Division of Vocational Rehabilitation because his disabilities were too severe. He stated:

"Due to the progressive nature of his disabilities, it was felt that future consideration of his case would not be beneficial.... There is no reasonable expectation that he can become employable through Vocational Rehabilitation services." Tr. 209.

At the hearing before the ALJ, plaintiff testified that he was 5' 10½" tall and weighed 268 pounds. He testified that he received his General Equivalency Degree in 1968. Tr. 32.

Plaintiff testified that in his most recent line of work, packing house labor, he had been required to work in a standing position and had to lift 150 to 175 pounds about twenty times an hour. Tr. 39. He also testified that he ceased working in August, 1978, after falling in the locker-room at work and injuring his back. Tr. 39-40.

Plaintiff testified regarding his various medical problems including diabetes, Tr. 40, 45, 54, back pain, Tr. 48-49, shoulder deformity, Tr. 41, possible tuberculosis, Tr. 51-52, chest pains, Tr. 41, headaches, Tr. 55, and dizziness, Tr. 55. He testified that his back pain had worsened since the accident at work. Because of his back pain, the time that he can sit or stand is limited. Tr. 51. In a typical day, plaintiff said that he would get the children up and get them off to school, but did not cook the breakfast, leaving that chore to the older children. Tr. 55. He would then spend most of the day laying down in a side position reading, and to some extent, supervising the youngest children until his wife returned from work. He read constantly. Tr. 56. He said he did very few household chores, and did not do the dishes or laundry. Tr. 63.

While plaintiff said he was able to drive, he generally drove only to Wednesday night Bible Class. He preferred not to drive. Tr. 57. He went out only to church on Sunday and Wednesday. Tr. 55. He usually could sit through the church services, which lasted about an hour. Tr. 63.

Plaintiff said that he could only sit about an hour and a half before he had to get up. He said it was better if he would then lay down and pull up his knees until some of the back pain was relieved. Tr. 64.

Plaintiff testified that he was referred to Vocational Rehabilitation but that they could not accept him for medical reasons. Tr. 59. When asked if he could perform an easy job in a sitting position working with light objects, he said he could only if he was allowed to lie down when he had to. Tr. 64-65.

Plaintiff testified that he was required to take various drugs which made him sleepy. Tr. 67. He said the drugs were required to combat back pain, gall bladder pain and tuberculosis. Tr. 67-68.

Near the end of the hearing, plaintiff's attorney requested that he be allowed to stand up while answering the last few questions. The ALJ replied, "No, it is not. Keep your seat. This will only take a couple more minutes." Tr. 67.

The ALJ found that claimant retained the residual functional capacity for at least sedentary physical activity, was 36 years of age, had high school education equivalency and semi-skilled vocational experience without transferable skills. He then applied those findings mechanistically to the tables in Subpart I, Appendix 2, 20 C.F.R. § 416.-903 (1980) and determined that plaintiff was not "disabled" and had not been disabled for any continuous period of at least 12 months. Tr. 6. In his evaluation of the evidence, the ALJ stated that "the medical evidence of record substantiates the existence of all impairments alleged by the claimant, but does not substantiate the severity alleged." Tr. 17.

The ALJ commented that plaintiff's weight gain made his motivation at least questionable. To the ALJ, the medical evidence disclosed:

"[d]iabetes under fair control and prognosis for good control with adherence to doctor's orders, tuberculosis diagnosed but showing no active symptoms, minimal musculoskeletal impairments, and no evidence of cardiovascular impairment." Tr. 17.

The ALJ did note that plaintiff was eliminated from his past occupations. The ALJ then used the regulatory grid in Appendix 2 to determine that plaintiff was not disabled. The ALJ then noted that approximately 200 separate unskilled sedentary occupations exist according to Rule 201.28 of Table No. 1 in Appendix 2, and that,

"Working within the limits of his residual functional capacity, Mr. Martin could have engaged in substantial gainful activity in one or more of these thousands of jobs existing in the national economy." Tr. 18.

The ALJ mentioned no specific jobs and made no attempt to discuss plaintiff's ability to perform any specific job.

The standard of review in this case is established in 42 U.S.C. § 405(g), which provides that "the finding of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...." Substantial evidence means such relevant evidence as a reasonable man would accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

■ It is not the duty of the Court to reweigh the evidence. *Garrett v. Califano,* 460 F.Supp. 888 (D.Kan.1978). A court does not fulfill its duty, however, by mechanically accepting the findings of the ALJ. *Pierson v. Dept. of H.E.W.,* Unpub. No. 79–1378 (D.Kan., filed September 9, 1980). It is the Court's duty to scrutinize the entire record to determine whether the Secretary's conclusions are rational. *Keef v. Weinberger,* 404 F.Supp. 1193 (D.Kan.1975).

■ The Court must examine all the evidence, including the evidence which detracts from or negatives the findings of the ALJ. *Pierson v. Dept. of H.E.W.,* supra. The Court cannot affirm the Secretary's decision just by isolating a few facts and determining that they constitute substantial evidence. *Cline v. Califano,* Unpub. No. 78–4166 (D.Kan. filed August 31, 1979).

■ In applying these standards, the Court should keep in mind that the purpose of the Social Security Act is to ameliorate some of the rigors of life for those who are disabled or impoverished. *Dvorak v. Celebrezze,* 345 F.2d 894 (10th Cir.1965).

This Court has examined the record carefully and has determined that there is no substantial evidence supporting the Secretary's findings and that the ALJ erred in a number of ways in reaching his conclusions. The two principal reasons the Court is unable to affirm the Secretary is that there is no substantial evidence that the claimant can perform even sedentary work, given the evidence of his pain, and the Secretary failed to meet his burden of showing specific work that claimant could do once it was determined claimant could not return to his previous occupation.

■ In this case it is admitted by the ALJ that the medical evidence of record substantiates the existence of all impairments alleged by the claimant. The ALJ then states that the complaints of back pain were not substantiated by any clinical findings. This inconsistency is resolved by the evidence in favor of the first statement. Dr. Poole's report of November 20, 1978, showed mild lumbar degenerative changes. Tr. 169. Dr. Siegal found evidence of a neuropathy after conducting an EMG and nerve conduction studies on plaintiff. Tr. 160. It is to be remembered that disability due to pain can occur even if there is a total dearth of objective medical evidence. E.g., *Cole v. Harris,* 641 F.2d 613 (8th Cir.1981). Of course, the existence of objective evidence makes claimant's case much stronger.

■ In this case, in addition to objective clinical findings, there is expert medical testimony from Dr. Poole and Dr. Kirk that plaintiff is disabled. Tr. 169, 208. While a statement by a physician is a conclusion upon the ultimate issue to be determined, *Lucas v. Richardson,* 348 F.Supp. 1156 (D.Kan.1972), it may be entitled to great weight where it is given by claimant's personal or treating physician. *Bastien v. Califano,* 572 F.2d 908 (2nd Cir.1978); *Hassler v. Weinberger,* 502 F.2d 172 (7th Cir.1974); *Payne v. Harris,* Unpub. No. 80–1027 (D.Kan., filed April 10, 1981), or where it is supported by competent medical evidence and is consistent with other evidence of the impairment. *Miller v. Califano,* Unpub. No. 78–1417 (D.Kan. filed January 9, 1980).

■ Dr. Poole, an orthopedic surgeon, first examined plaintiff on August 25, 1978, and medical records indicate Dr. Poole became plaintiff's treating physician for his back problems. Tr. 132, 150–152, 168–169. Dr. Poole's conclusion that plaintiff was not fit for work is supported by competent medical evidence. Tr. 168–169. While Dr. Kirk's opinion of June 5, 1979, that plaintiff could not engage in any gainful activity

was not explained in any detail, Dr. Kirk had been plaintiff's treating physician for six months, and his opinion is entitled to substantial weight.

The ALJ apparently relies on the opinions of ability to work given by other physicians. The ALJ noted that Dr. Galachia stated that the prognosis for working was extremely good with the right attitude. Tr. 17. What the ALJ failed to note was that Dr. Galachia was giving his opinion only as to plaintiff's cardiovascular complaints and referred any discussion of musculoskeletal complaints to an orthopedic surgeon. Tr. 170. The ALJ stated that Dr. Mendiones noted that plaintiff's complaints exceeded his physical examination findings. Tr. 17. Dr. Mendiones made no findings as to plaintiff's ability to work, however, and was only a consultative and not a treating physician.

The ALJ failed to even discuss the opinions of Dr. Poole and Dr. Kirk that plaintiff was disabled. As these opinions appear to the Court to be uncontroverted, the ALJ should have at least pointed to the existence of any substantial evidence upon which to disregard these expert opinions.

The ALJ also failed to evaluate the psychological and emotional factors involved in plaintiff's pain. It is error to ignore the psychological overtones of medical diagnoses. *Cole v. Harris,* supra; *Aquino v. Harris,* 516 F.Supp. 265 (E.D.Pa.1981). There is a great deal of medical evidence that plaintiff's back pain was enhanced by psychological factors such as depression and anxiety. Tr. 154–155, 157–158, 170, 173.

The following statement from a recent decision of the Eighth Circuit is fitting in the context of this case:

"Most injuries or illnesses produce physiological or functional consequences and depending upon the physical makeup of the person involved, the level of pain experienced may or may not produce a disabling injury. In *Landess v. Weinberger,* 490 F.2d 1187 (8th Cir.1974), we wrote: 'These claimants are real people and entitled to have their disabilities measured in terms of their total physiological well-being. Different people react in markedly different ways to similar injuries. A back condition may affect one individual in an inconsequential way, whereas the same condition may severely disable another person who has greater sensitivity to pain or whose physical condition, due to age, obesity, deformity, or general physical well-being is generally deteriorated.'"

*Brand v. Secretary of Dept. of HEW,* 623 F.2d 523, 526–527 (8th Cir.1980).

It is apparent that the ALJ gave insufficient consideration to the testimony of the plaintiff. Plaintiff's testimony concerning his daily routine and social life (or lack thereof) is consistent with his claim of disability. It is also consistent with the medical opinions that he is disabled. If the ALJ did not believe plaintiff's subjective testimony, he should have made specific findings supporting his disbelief. *Marcus v. Califano,* 615 F.2d 23 (2nd Cir.1979); *Dobrowolsky v. Califano,* 606 F.2d 403 (3rd Cir. 1979); *Clifton v. Sec'y of Dept. of HEW,* 505 F.Supp. 614 (W.D.N.Y.1980). In this case, the ALJ merely opined in a backhanded way that plaintiff's weight problem made his motivation "questionable." Tr. 17. Not only does this fail to rise to the level of a specific finding that plaintiff has credibility problems, there is no substantial evidence supporting a conclusion that plaintiff is not to be believed. To equate a weight problem with lack of credibility is, in a word, ridiculous. The medical evidence of plaintiff's psychological problems of anxiety and depression most likely provide the reason for plaintiff's weight problem. The same evidence of emotional overlay may be a factor in the ALJ's disregard for plaintiff's testimony, but as the Court has noted, these psychological and emotional factors may be a part of disability.

Not only has the ALJ failed to give due consideration to expert medical testimony, plaintiff's psychological problems, and plaintiff's own testimony, he has also failed to give due consideration to the only vocational evidence offered in this case—the determination of the Kansas Division of Vocational Rehabilitation that due to plain-

tiff's disabilities, there is no reasonable expectation he could obtain employment through Kansas Vocational Rehabilitation Services. Tr. 209. This opinion is especially important where, as here, there is a determination that plaintiff cannot return to his previous occupation.

■ It is settled law that once plaintiff has met the initial burden of establishing that his disability prevents him from returning to his previous occupation, the burden of showing that he could perform some other kind of substantial work available in the economy falls upon the Secretary. E.g., *Salas v. Califano,* 612 F.2d 480 (10th Cir. 1979); *Ferguson v. Schweiker,* 641 F.2d 243 (5th Cir.1981). As Judge Goldberg noted in *Ferguson:*

> "The burden of showing by substantial evidence that a person who can no longer perform his former job can engage in other substantial gainful activity is in almost all cases satisfied only through the use of vocational expert testimony may not be necessary to satisfy the Secretary's burden of proving a prima facie disabled claimant can do other work available in the national economy, . . . the general rule is that such testimony is required."

*Ferguson v. Schweiker,* 641 F.2d at 247–248. See *Swisher v. Harris,* Unpub. No. 79–4028 (D.Kan., filed July 10, 1980); *Boeh v. Califano,* Unpub. No. 77–2159 (D.Kan., filed August 15, 1978).

The Secretary has determined that vocational expert testimony is no longer required to meet his burden in a case such as this. Instead, the Secretary relies on a new regulatory scheme which became effective on February 29, 1979. This scheme, often called the "grid system," was described by Judge Rogers in *Walker v. Harris,* 504 F.Supp. 806, 809 (D.Kan.1980).

In this case, since it was determined that plaintiff could not return to his previous occupation, the ALJ proceeded to the fifth step in the sequential evaluation, in which the ALJ's assessment of various factors were applied to the Table in Appendix 2 to the regulations. Plaintiff contends that the grid, as applied in this case, is inadequate to meet the Secretary's burden of proof. The Court agrees.

The regulatory grid system has been a source of concern to a number of courts. See *Walker v. Harris,* supra; *Phillips v. Harris,* 488 F.Supp. 1161 (W.D.Va.1980); *Deutsch v. Harris,* 511 F.Supp. 244 (S.D.N.Y.1981); *Tunstall v. Schweiker,* 511 F.Supp. 470 (E.D.Pa.1981). While the grid system may be theoretically helpful and a correct application may satisfy the legal requirements in some cases, a mechanical adherence to the grid system results in a disregard of the specific facts of an individual case. For a number of reasons, the Court is at a loss as to how the Secretary can satisfy the burden of proof of showing that this claimant can perform some other line of work through use of the grid.

First, the ALJ, in using the grid, failed to take into account nonexertional factors such as the evidence of the plaintiff's psychological impairments. The regulations themselves note that where nonexertional limitations are present, the Tables in Appendix 2 may not be sufficient in determining if disability is present. Appendix 2, Sec. 200.00 to 20 C.F.R. § 416.903.

More importantly, the ALJ makes the assumption that plaintiff can perform the entire range of sedentary work. As noted previously, there is no substantial evidence that plaintiff can perform even sedentary work of any type, much less the entire range of sedentary work. Even if plaintiff might be able to perform some sedentary work, it is error to assume that he can perform all sedentary work and apply the tables using that assumption. The testimony of the plaintiff would indicate that plaintiff must stand or lie down periodically to relieve his pain. As was recently noted:

> "The category of sedentary work may not include occupations which allow a worker to alternate sitting or standing as required for his comfort. . . . See *Moquez v. Harris,* Civil No. 80–A–170 (D.C.Colo. 1980) (The sedentary category of work as

defined in 20 C.F.R. § 404.1567(a) 'does not necessarily include occupations which allow a worker to alternate sitting and standing as required for his comfort or jobs that require no stooping or bending.')"

*Deutsch v. Harris,* 511 F.Supp. 244, 249 (S.D.N.Y.1981).

Most importantly, the mechanical use of the regulations fails to satisfy the ALJ's burden because it totally disregards the key legal doctrine that the Secretary must show that an *individual* claimant can perform some specific type of work. The following judicial language is perfectly applicable to this case:

"The Secretary has used this mechanical formula to avoid the requirements of well established case law; instead of going forward with the burden of proof as required, they have rested on the Administrative Law Judge's application of Appendix II. This practice is deficient. In the instant cases, the Law Judge failed to identify any specific jobs in which the plaintiffs could be expected to perform. No vocational expert testified. No attempt was made to identify the skills necessary in any of the alternate work roles that were considered to be within the plaintiffs' capacity. No attempt was made to assess the limitations imposed by plaintiffs' specific impairments against the requirements of any particular job. In short, it is obvious the Secretary has failed to discharge the burden of going forward with evidence of capacity for a specific alternate job in the national economy and proof of transferable skills."

*Phillips v. Harris,* supra, quoted in *Walker v. Harris,* supra.

The Court is aware that, in a number of cases, courts have upheld the application of the regulations in the absence of vocational testimony. *Frady v. Harris,* 646 F.2d 143, Unemp.Ins.Rep. (CCH) 17,471 (4th Cir. 1981); *Messner v. Califano,* 496 F.Supp. 1007 (E.D.Pa.1980); *Stallings v. Harris,* 493 F.Supp. 956 (W.D.Tenn.1980); *Crowe v.*

*Harris,* 489 F.Supp. 683 (E.D.Tenn.1980); *Halsted v. Harris,* 489 F.Supp. 521 (E.D.Mo. 1980). Undeniably, the courts are divided on this issue. This Court finds itself more in agreement with the dissenting opinion of Judge Hall in *Frady:*

"The Secretary has exhibited a complete disregard of the procedural standards adopted by this Court, all under the guise of an administrative table purportedly designed to save time and money. In this case, the table undoubtedly saved time and money, but unfortunately did so at Frady's expense.

. . . . .

In the final analysis, this decision is a perfect example of the mechanical application of administrative regulations without concern for the fundamental concepts of disability evaluation. Regardless of the regulations, the Secretary is obligated to set forth the claimant's specific skills, the specific jobs for which the claimant qualifies, the availability of those jobs, and the basis for each such finding. In many cases these obligations will require the use of vocational experts." *Frady v. Harris,* supra.

In conclusion, there is no substantial evidence supporting the Secretary's finding that claimant is not disabled.

IT IS THEREFORE ORDERED that the motion for summary judgment of the defendant is hereby overruled; and this case is remanded for further administrative hearings.