William S. McLAUGHLIN, Appellant,

v.

SECRETARY OF HEALTH, EDUCATION AND WELFARE OF the UNITED STATES, Appellee.

No. 323, Docket 79–6079.

United States Court of Appeals, Second Circuit.

Submitted Oct. 25, 1979.

Decided Jan. 10, 1980.

William S. McLaughlin, appellant pro se.

Terrence M. Kelly, Asst. U. S. Atty., Albany, N. Y. (George H. Lowe, U. S. Atty., Syracuse, N. Y., of counsel), for appellee.

Before FRIENDLY, OAKES and NEWMAN, Circuit Judges.

OAKES, Circuit Judge:

■ Appellant pro se sought disability benefits under the Social Security Act, 42 U.S.C. § 423. At two hearings before an administrative law judge (ALJ), appellant's treating physician Dr. Fiore, appellant's wife (who assisted him as counsel) and appellant himself testified as to his disability, but there were also reports of an orthopedic surgeon, a neurosurgeon, and a psychiatrist who were in opposition. The ALJ then took testimony from a "medical adviser."[1] The adviser was Dr. Clark, an orthopedic surgeon who had examined the other doctors' reports and various hospital records, but had not examined appellant and had not seen certain X-rays relied upon by Dr. Fiore. The ALJ found against appellant, and his findings were upheld by the HEW Appeals Council. In turn the United States District Court for the Northern District of New York, James T. Foley, Chief Judge, held that there was "substantial evidence" to support the findings, viewing the record as a whole. 42 U.S.C. § 405(g); *see Bastien v. Califano*, 572 F.2d 908, 912 (2d Cir. 1978). While we agree with this conclusion, we reverse because the ALJ imposed undue limitations on cross-examination of the "medical adviser" with respect to a highly material point. We remand to the Secretary for a reweighing of the evidence in the light of appropriate cross-examination and two other applicable rules of law.

A principal complaint of appellant concerned his back, which, he said, was injured in an airplane crash in 1967. Dr. Fiore, his treating physician at the Veterans Administration Hospital (appellant had been a career Marine), testified that appellant had discogenic problems. He based this on clinical observations and objective findings of a flat lumbar curve, decreased pin sensation in the left lateral malleolus area, absence of

---

1. Use of a "medical adviser" was approved in *Richardon v. Perales*, 402 U.S. 389, 408, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), which also upheld the introduction into evidence of reports from doctors not available for cross-examination.

knee and ankle jerks, and narrowing of the L–5, S–1 interspace on X-ray. Following the doctor's testimony to this effect the ALJ asked the question: "Now, what gets me is that no one thought that he had a discogenic problem that would warrent [sic] investigation by myelography. That to me is a very important point."

Myelography is, of course, injection of a radio-opaque substance into the fluid in the spinal column with subsequent X-ray examination of the spine at different levels by tilting the table on which the patient lies. While it used to be widely utilized for "investigation" as the ALJ suggested, Dr. Fiore testified that there was a "unanimity" of medical opinion that myelography is used only (1) when there is suspicion of a problem other than a disc problem (such as a tumor), or (2) in connection with suspected disc pathology only as a preoperative procedure so as "to absolutely be certain of where the nerve root irritation is, the level and whether it's bilateral and whether it's a segment above and below as well." Following this the ALJ not insignificantly remarked that "this was not [his] opinion." Quite evidently he had been of the view that myelography was routinely done for purposes of documentation, not just for preoperative delineation of actual anatomical pathology.

When at the second hearing, over ten months later, the medical adviser, Dr. Clark, testified, he took direct issue with Dr. Fiore and supported the earlier view of the ALJ by testifying:

Q. [by ALJ]. Is that—Could you make a comment if that [Dr. Fiore's view as to myelography] is general procedure or general medical—how will I put it? General—what procedure with the respect to the use of myleograms [sic]?

A. I don't necessarily agree with the statements previously made by Dr. Fiore. You can't definitely diagnose a disc unless you see it. That means opening by surgery. If there's a question in one's mind as to whether there is a disc, as in this case where there's only subjective evidence of a disc lesion, then I would feel that a myleogram [sic] would be of extreme importance in coming to an accurate conclusion.

The medical adviser then went on to say that he did not feel that the claimant had a ruptured disc: "maybe bulging but it's very minimal."

After much beating around the bush, to be sure, on cross-examination by the claimant himself he sought to interrogate the doctor on myelograms: "I want to know how he feels about them. When he would use them? What risk is involved in them? When would he recommend them? Under what conditions?" Inexplicably the ALJ, who had previously thought this point so "important" and who had had his own view, rather than that of Dr. Fiore, as to the use of myelography substantiated by the "medical adviser," Dr. Clark, refused to let any of these or other questions be asked. The ALJ said, "But it [myelography] hasn't been used in your case."

This is hardly a reason for excluding the questions, which went to the crucial issue whether Dr. Clark's or Dr. Fiore's views were to be given greater weight as predicated on sounder medical principles. Subsequent questions on the same subject were ruled "irrelevant" although Dr. Clark answered one, before the ALJ could interrupt, by saying that "I have never performed a myleogram [sic]." Claimant's wife recalled to the ALJ his own statements from the previous hearing, quoted above in part, which referred to the importance the ALJ attached to the fact that no myelography had been ordered. But he adhered to his ruling that further interrogation as to myelography or myelograms was improper.

This was at the heart of appellant's case. Weighty medical authority supports the views of Dr. Fiore and not those of the ALJ or the medical adviser on the subject of myelography. M. B. Howorth, *A Textbook of Orthopedics* 1036 (1952), says:

Marked contrasting thinness of an intervertebral space is the most significant finding suggesting a ruptured disc. *Myelography* (Figs. 454 to 456), using an opaque medium intraspinally, is a defini-

tive method of diagnosis but should only be used when the symptoms or signs are in themselves of sufficient severity to demand surgical intervention. It should not be used merely as a diagnostic procedure since it is not entirely innocuous. S. Brock, *Injuries of the Brain and Spinal Cord* 626–29 (4th ed. 1960), says:

> The indications for the use of myelography and its value in the diagnosis of herniations of the nucleus pulposus or protrusion of the annulus fibrosus are still matters of controversy. A large number of articles have been published in the past years, however, attesting to the value of myelography with Pantopaque (ethyl iodophenylundecylate) as an aid in the *pre-operative* diagnosis of these lesions of the intervertebral discs (Spurling and Thompson, 1943) and many authors (Childe, 1945; Soule et al., 1945; Echlin et al., 1945, 1946; Begg et al., 1946) are of the opinion that the test should be used as a routine *pre-operative* procedure in all suspected cases, *providing operation is contemplated.* . . . The writer believes that myelography with Pantopaque should be performed *pre-operatively* in all cases suspected of having a posterior herniation or protrusion of disc tissue. *The myelogram should not be done until the patient has failed to respond to conservative orthopedic measures, or in other words until such time as operation is indicated.* . . . The patient should usually remain in bed at least two to three days after myelography as post-lumbar puncture headache may otherwise follow its use. This is one reason for postponing the procedure until pre-operatively. . . . The diagnosis of a herniation or protrusion of disc tissue is primarily clinical.

(Emphasis added.)[2]

The ALJ, in recounting the testimony of Dr. Fiore, in his findings pointed to his own "observation that although claimant was believed to have a discogenic problem, yet there was no investigation by myelography," again suggesting that he thought myelography could be used for purely "investigative" purposes. He went on to find that "[w]hile the record reflects symptomatic evidence of claimant's principal problems, i. e., the back, arm, and leg, there is no convincing clinical or laboratory evidence of their actual presence in any significant degree" and that "it is my considered belief that a preponderance of the objective evidence clearly reflects that claimant has a stiffness of the back and does not have an intervertebral disc problem." Thus, the very findings made by the ALJ show that questions pertaining to the use of myelography for diagnostic purposes only, as the medical adviser, Dr. Clark, thought was advisable, went directly to the weight of his testimony as opposed to that of Dr. Fiore, the treating physician.

The ALJ decided ultimately that "Dr. Fiore's opinions . . . did not have sufficiently objective medical support so that those opinions could be relied upon." We remand therefore for the limited purpose of permitting cross-examination of Dr. Clark on the subject of myelography and for a reweighing of the evidence accordingly, bearing in mind the following rules of law:

1. "While a claimant must show that the physical or mental impairment by reason of which he claims to be disabled 'results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques,' 42 U.S.C. § 423(d)(3), this does not mean that medical opinion must necessarily be supported by 'objective' clinical or laboratory findings." *Cutler v. Weinberger,* 516 F.2d 1282, 1286–87 (2d Cir. 1975). As stated in *Marcus v. Califano,* 615 F.2d 23, at 27 (2d Cir. 1979), "It has been established both in this Circuit and elsewhere, that subjective *pain* may serve as the basis for establishing disability, even if

---

2. We are not taking judicial notice of the appropriate uses of myelography, of course. We merely indicate that Dr. Clark's position was sufficiently controversial to merit cross-examination.

such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence . . .." Nevertheless, "[t]he ALJ has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Id.* at 27.

2. "The expert opinions of a treating physician as to the existence of a disability are binding on the factfinder unless contradicted by substantial evidence to the contrary." *Bastien v. Califano,* 572 F.2d 908, 912 (2d Cir. 1978). While there was such evidence here, the medical adviser's contrary views may in the light of cross-examination be given less weight.

Judgment reversed and cause remanded.