**John J. SCANLON, Plaintiff,**

v.

**Margaret M. HECKLER, Secretary, Department of Health and Human Services, Defendant.**

**No. 82 Civ. 7260 (SWK).**

United States District Court, S.D. New York.

April 18, 1984.

David B. Ampel, P.C. by Kenneth S. Ampel, New York City, for plaintiff.

Rudolph W. Guiliani, U.S. Atty., S.D.N.Y. by Sally Lord, Asst. U.S. Atty., New York City, for defendant.

### MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

Claimant John Scanlon ("Scanlon") brought this action pursuant to § 205(g) of the Social Security Act, as amended (the "Act"), 42 U.S.C. § 405(g), for review of a final determination by the Secretary of Health and Human Services (the "Secretary"), which denied his claim for a period of disability and disability insurance benefits. The case is currently before this Court upon cross-motions for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons stated more fully below, the Secretary's determination is not supported by substantial evidence and is based upon an apparent failure to apply proper legal principles; therefore, this matter will be remanded to the Secretary for further proceedings in accordance with the directions set forth below.

### BACKGROUND

On June 24, 1981, Scanlon, a former New York City Police Officer, filed an application for disability insurance benefits, based on lower back problems, including a herniated disc with arthritis (Tr. 50–53).* His application was denied initially on October 2, 1981 (Tr. 54–58), because, although he could not return to his prior work, he could perform sedentary work available in the national economy. Scanlon sought reconsideration of this determination, and on January 13, 1982, his application was again denied because he could perform sedentary work available in the area where he resides (Tr. 65). Scanlon then requested a hearing. On May 4, 1982, Administrative Law Judge Irwin N. Portnoy (the "ALJ") conducted a hearing on plaintiff's claim (Tr. 22–49). Following a *de novo* review of Scanlon's

claim, the ALJ found that Scanlon was not entitled to a period of disability or disability insurance benefits by decision dated June 10, 1982 (Tr. 12–16). Scanlon appealed that decision, and submitted an additional medical report from a Dr. Orfeo Brucato for consideration by the Appeals Council (Tr. 8–11, 146–48). On September 23, 1982, the Appeals Council refused to review the ALJ's decision, making it the final decision of the Secretary (Tr. 4–5).

Scanlon testified that he was born in the United States on September 4, 1945 (Tr. 27). He has a high school education (Tr. 31). After high school, Scanlon worked at First National City Bank—first as a messenger and then as a teller (Tr. 36). After five years at the bank, Scanlon became a New York City Police Officer. He was employed as a police officer for just over ten years before he retired on partial disability on August 1, 1979 (Tr. 32). His duties while a police officer required Scanlon to patrol—walk or stand—for approximately six hours and sit for an additional two (Tr. 32–34). During the course of his work, Scanlon would occasionally be required to help lift things, including victims, ranging up to 75 to 150 pounds. (Tr. 34).

Scanlon testified that his injury is a work related injury (Tr. 32), and that his injury was exacerbated by a fall he took in May, 1981 (Tr. 39). Scanlon, who walks with a cane, stated that he cannot sit or stand for an extended period of time because he suffers pain in his lower back and left thigh (Tr. 40–41). During the hearing, Scanlon stood and sat, alternately, for about fifteen minutes at a time each, claiming that he did so because of discomfort (Tr. 15, 24, 32, 37, 45). The only position that he is comfortable in is laying down (Tr. 41). He also testified that he has no feeling in his left toes (Tr. 40). Scanlon takes medication for his pain, but he claims that it provides only slight relief, dulling the pain but not eliminating it (Tr. 40), while also making him tired (Tr. 46–47).

---

* References to the certified transcript of the administrative proceedings filed as part of the

Secretary's answer shall be denoted herein as "Tr." followed by the page(s) referred to.

Scanlon testified that he has difficulty sleeping because of the pain he is in (Tr. 46–47). He also claimed that his pain prevented him from doing the exercises, squatting and touching his knees to his chest, that had been prescribed for him (Tr. 44).

Scanlon testified that he is separated from his wife. The separation was caused by his impotence which is a result of the pain he suffers (Tr. 28–29). He does not live at his home with his wife. He is living with an undercover narcotics agent (a former partner of his on the police force) and his ex-partner's wife (Tr. 30). He testified that he spends an average day at this home reading or watching television (Tr. 41–42). He spends some time talking with his ex-partner and wife, but tries not to interfere with their lives too much (Tr. 42, 45–46). Occasionally, Scanlon has visitors at this house (Tr. 44–45). He rarely leaves this house. He stated that he occasionally walks about a block to get a paper, or to go to the park down the block (Tr. 43, 45), but that he walks no further. He tried to go to a drive-in movie with his ex-partner once, but could not sit long enough (Tr. 43). His ex-partner occasionally takes him for a short ride in the car, but Scanlon testified that he is very uncomfortable in the car (Tr. 43). His own drivers' license has lapsed (Tr. 31). Scanlon's ex-partner and wife do all the housework and cooking (Tr. 42, 44).

Scanlon appeared at the hearing with a cast on his right foot and ankle. He testified that he had fractured his ankle when his leg gave way (Tr. 37–38). Hospital records indicate that x-rays were taken, which revealed a dislocation, and that a diagnosis of ankle sprain was given (Tr. 147–48).

The other medical evidence submitted by Scanlon to the ALJ and the Appeals Council included two reports by Dr. John Nailor, who has been treating Scanlon for his back injury since June 1, 1981. Dr. Nailor's first report (Tr. 90–93), dated July 20, 1981, indicated clinical findings of a 20% loss of flexion in the lumbosacral spine and no extension. His residual functional capacity assessment indicated that Scanlon could sit, stand, and walk for two hours each during an eight hour work day; could occasionally lift or carry up to ten pounds, but never any more than ten pounds; could bend occasionally, but never squat, crawl, or climb; and that Scanlon could use both hands to grasp, push or pull, and perform fine manipulations. Dr. Nailor noted no other limitations at that time.

Dr. Nailor's second report (Tr. 107–11), dated April 5, 1982, indicates a deterioration in Scanlon's condition, although it does note that there is "no change in status." The clinical findings included 30 degrees forward flexion, spasms of the lumbosacral musculature, limited straight leg raising of the left leg, and decreased sensation. The diagnosis was herniated nucleus pulposus with degenerative changes. On a different form from that filled in on July 20, 1981, Dr. Nailor indicated the following physical capacities evaluation, or residual functional capacity assessment: Scanlon could not stand, sit, or walk at all in an eight hour work day; could occasionally lift or carry up to ten pounds, but never any more than ten pounds; could use his right foot for repetitive movements, but not his left foot; could not bend, squat, crawl, or climb at all; and that Scanlon was totally restricted from activities involving unprotected heights, moving machinery, and driving automotive equipment, but only mildly restricted from those involving marked changes in temperature and humidity. Dr. Nailor concluded that Scanlon was "permanently disabled" at that time.

As part of his application for disability benefits, Scanlon was examined, on September 11, 1981, by Dr. A. Gourji at the request of the disability determination service. In his report (Tr. 96–103), Dr. Gourji found that Scanlon could not descend to a squatting position from a standing position because of severe pain in his back. Dr. Gourji further found that forward flexion at the waist was up to 25°; lateral bending up to 5° bilaterally; and posterior extension up to 5° with moderate to severe pain. Scanlon was unable to stand on his toes

and heels. On examination of Scanlon in the sitting position, Dr. Gourji found that knee extension caused complaints of pain in the left leg and back. Deep tendon reflexes were normal bilaterally. On examination of Scanlon in the supine position, Dr. Gourji found that hip flexion and rotation on the left was unrestricted, but caused severe pain. Straight leg raising on the left was up to 45–50°, but brought severe pain in the back; on the right, up to 65° with moderate pain in the back. Dr. Gourji concluded that Scanlon was suffering "moderate to severe chronic low back pain syndrome with consistent evidence for [sic] a clinical impairment." In his residual functional capacity assessment, using the same form as Dr. Nailor's first report, Dr. Gourji found that Scanlon could sit for two hours during an eight hour work day, but could not stand or walk at all; could occasionally lift or carry up to ten pounds, but never any more than ten pounds; could not bend, squat, crawl, or climb at all; and that Scanlon could use both hands to grasp, push or pull, and perform fine manipulations.

Scanlon was again examined by a doctor at the request of the disability determination service, this time by Dr. R. Bagner of the Mo-Vern Medical Group, on December 15, 1981. In his report (Tr. 104–106), Dr. Bagner noted that Scanlon walked without a limp or deformity, but that he walked with, and appeared dependent upon, a cane. In a brief discussion of his findings with respect to Scanlon's back, Dr. Bagner noted no spasm of the paraspinal muscles; localized tenderness in the areas of TT4–T5 and T5–S1; and no atrophy to the gluteal, thigh, or calf muscles. Dr. Bagner found no pain on straight leg raising of the right leg, but found pain at 30° on raising of the left leg. Dr. Bagner also found that flexion was limited to 20°, extension of the back to 10°, and lateral rotation to 10°. Finally, Dr. Bagner found there to be diminished sensation along the medial and lateral aspects of the left leg. Dr. Bagner concluded that Scanlon suffered from lumbar disc disease.

A computerized tomographic study of Scanlon's lower lumbar spine was performed by Dr. Richard H. Hamilton on June 28, 1979. In his report (Tr. 112–16), Dr. Hamilton indicated that the study revealed a herniated nucleus pulposus at the L5–S1 level with posterior displacement of the dural sac, evidence of a narrowing of the apophyseal joints in the lower lumbar spine, and a spinabifid occulta of S1.

Subsequent to the ALJ's decision, Scanlon submitted an additional report, this one by Dr. Orfeo Brucato, for consideration by the Appeals Council (Tr. 149–50). Dr. Brucato indicated that he had been treating Scanlon on a monthly basis for six months for his diagnosis of chronic anxiety, hypertension, and chronic bilateral blepharitis. Scanlon is taking Lasix and valium for these afflictions.

## DISCUSSION

A claimant is entitled to disability benefits under the Social Security program if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected ... to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1). The burden of proving disability is on the claimant. *E.g., Parker v. Harris,* 626 F.2d 225 (2d Cir.1980). Once the claimant has established a *prima facie* case by showing that his impairment prevents his return to his prior employment, the burden shifts to the Secretary, who must show that there exists alternative substantial gainful work in the economy which the claimant could perform, considering not only his physical capacity but also his age, education, experience and training. *See Berry v. Schweiker,* 675 F.2d 464 (2d Cir.1982); *Parker,* 626 F.2d at 231.

The regulations set forth a five-step sequence to be utilized in evaluating a disability benefit application. First, the trier of fact should consider the claimant's current work activity. If the claimant is currently engaged in substantial gainful activity, that ends the inquiry—the claimant will not

be found to be disabled. Second, the trier of fact should determine whether the claimant has a "severe impairment" which significantly limits his capacity to perform "basic work activities." "Basic work activities" are defined as including physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, and handling. If there is no "severe impairment," no further consideration is necessary. Third, the trier of fact should determine whether the claimant has one of the impairments described in Appendix I of the regulations. If the condition qualifies as one of the impairments under the guidelines, the claimant must be found to be disabled without further inquiry or consideration of vocational factors. Fourth, the trier of fact should determine whether the claimant's impairment prevents his return to his prior work. Fifth, if the claimant cannot perform his prior work, the trier of fact should consider whether the claimant can perform some other job available in the community, considering his remaining physical and mental capacity, age, education, experience, and training. 20 C.F.R. § 404.1503; *see Berry*, 675 F.2d 464; *see also Garcia v. Heckler*, No. 83–3544, slip op. (S.D.N.Y. March 16, 1984). As noted above, the claimant bears the burden of proof as to the first four steps while the Secretary must prove the final one. *Berry*, 675 F.2d at 467.

■ In addressing these questions, the trier of fact should consider the following: (1) objective medical facts, clinical findings, diagnoses, and medical opinions; (2) subjective evidence of pain and disability as testified to by the claimant and as corroborated by others who have observed him; and (3) background data such as claimant's age, education, and previous work experience. *Parker*, 626 F.2d at 231; *Bastien v. Califano*, 572 F.2d 908 (2d Cir.1978). These elements of proof should be considered together and in combination with each other. *Id.* at 912; *Gold v. Secretary of HEW*, 463 F.2d 38, 41 n. 2 (2d Cir.1972).

■ In general, the expert opinions of a treating physician as to the existence of a disability are binding on the fact finder unless contradicted by substantial evidence. *Aubeuf v. Schweiker*, 649 F.2d 107, 112 (2d Cir.1981); *McLaughlin v. Secretary of HEW*, 612 F.2d 701, 705 (2d Cir. 1980). Further, where as here, the claimed disability results in part from severe pain, the application for benefits should be evaluated under "the standard that a medical impairment which results in severe disabling pain may give rise to a grant of disability even if 'objective' clinical findings do not provide proof of an affliction ordinarily causing such pain." *Aubeuf*, 649 F.2d 107, 114 (2d Cir.1981) (*quoting Marcus v. Califano*, 615 F.2d 23, 28 (2d Cir. 1979)). As the Second Circuit recently stated, "[p]ain itself may be so great as to merit a conclusion of disability where a medically ascertained impairment is found, even if the pain is not corroborated by objective medical findings." *Rivera v. Schweiker*, 717 F.2d 719, 724 (2d Cir.1983). Of course, the ALJ is not obligated to accept as true a claimant's unsupported self-serving, subjective statements pertaining to his pain. *See Aubeuf*, 649 F.2d at 114; *Marcus*, 615 F.2d at 27. Such subjective evidence may be evaluated with due consideration to credibility, motivation, and medical evidence of impairment. *Delgado v. Secretary of HHS*, 586 F.Supp. 188 at 191 (S.D.N.Y.1983). However, the ALJ should not discredit the claimant's testimony if supported by substantial evidence. *Rivera*, 717 F.2d at 724.

The standard for judicial review of disability determinations made by the Secretary is established by § 205(g) of the Act. That section provides that the Secretary's factual findings shall be conclusive if supported by substantial evidence, which has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305

U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

The substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts. *Rodriguez v. Califano,* 431 F.Supp. 421, 423 (S.D.N.Y. 1977); *Beane v. Richardson,* 457 F.2d 758, 759 (9th Cir.), *cert. denied,* 409 U.S. 859, 93 S.Ct. 144, 34 L.Ed.2d 105 (1972). In short, the reviewing court is not to decide the case *de novo,* and the Secretary's determination will be conclusive even in instances where the court's independent analysis of the evidence may differ from that of the Secretary. *Reading v. Mathews,* 542 F.2d 993, 997 (7th Cir.1976). A reviewing court is not required to accept the Secretary's determination, however, if the Secretary failed to apply proper legal principles or failed explicitly to consider evidence critical to a just determination of claimant's application. *Parker,* 626 F.2d at 231; *Cutler v. Weinberger,* 516 F.2d 1282, 1285 (2d Cir. 1975).

In this case, the Secretary's determination is not supported by substantial evidence and is based upon an apparent failure to apply proper legal principles. The ALJ's determination is based on his finding that Scanlon "does not have any impairment or impairments which significantly limit the ability to perform basic work-related functions" (Tr. 16). In reaching this conclusion, the ALJ completely discredited Scanlon's testimony concerning the extent and severity of the pain he is suffering. Moreover, the ALJ completely discredited the assessments of Scanlon's capacity by Dr. Nailor, the treating physician.

As noted above, the expert opinions of a treating physician are normally binding upon the Secretary unless they are contradicted by substantial evidence. *See Aubeuf,* 649 F.2d at 112. Here, Scanlon submitted two reports from Dr. Nailor, his treating physician. Dr. Nailor treated Scanlon twice monthly over an approximate ten month period. Dr. Nailor's first report, issued after almost two months of clinical observation and treatment, contained a residual functional capacity evaluation form to provide, in an objective format, an indication of the limits of claimant's physical abilities. Dr. Nailor's responses on this form pellucidly demonstrate that, in his opinion, Scanlon was severely restricted in his ability to perform some of life's most basic functions. For example, Dr. Nailor indicated that Scanlon could only sit, stand, or walk for two hours each in an eight hour work day, and could only occasionally bend or lift and carry light items weighing no more than ten pounds (Dr. Nailor's report is discussed more fully above). Dr. Nailor's second report, issued after an additional eight months of clinical observation and treatment, indicated his diagnosis of degenerative changes in Scanlon's condition. Dr. Nailor's second report also contained, albeit on a new form, a residual functional capacity assessment. Dr. Nailor's responses on this form indicate that, in his opinion, Scanlon was even more severely restricted at that time in his ability to perform life's basic movements and functions. Scanlon, for example, could no longer sit, stand, or walk for up to two hours each in an eight hour work day (indeed, he could not sit, stand, or walk at all). Scanlon also could not bend at all. Dr. Nailor concluded from this evaluation, and presumably from the deterioration he had observed over the ten month span of his treatments, that Scanlon was permanently disabled.

The ALJ found these two reports to be so inconsistent as to be unreliable, and totally discredited them. They are not, however, so patently inconsistent, especially when viewed over time and in conjunction with other medical records in evidence. Moreover, nothing in the medical record contradicts Dr. Nailor's findings that Scanlon's range of movement is severely restricted and that he complains of severe pain. The residual functional capacity evaluation prepared in November, 1979, by a consultative physician for an earlier unsuccessful application by Scanlon for benefits (not at issue here) indicates that, at

that time, Scanlon could sit for six hours and stand or walk for two hours each in an eight hour day, and could occasionally do the following: lift or carry up to twenty pounds; squat; bend; crawl; and climb. (Tr. 124). Dr. Nailor's first report, issued subsequent to this report, paints a bleaker picture. Moreover, the report of Dr. Gourji, one of the Secretary's own consulting physicians, issued during the period intervening between Dr. Nailor's two reports, indicates a continued deterioration of Scanlon's condition. In his residual functional capacity assessment, Dr. Gourji found that, at that time, Scanlon could still sit for up to two hours during an eight hour work day, but could not stand or walk at all, and could not bend. Thus, Dr. Nailor's reports are not so patently inconsistent to warrant the label "unreliable," rather they confirm the pattern seen when viewing all the medical evidence together over time—to wit, a degenerating condition.

The report of Dr. Bagner, another consultative doctor for the Secretary, does not contradict this. The report contains Dr. Bagner's findings of pain when Scanlon raises his left leg, loss of flexion, loss of extension, loss of lateral rotation, and loss of sensitivity to a pin prick. Dr. Bagner diagnosed lumbar disc disease. This is not clearly contradictory to Dr. Nailor's findings. Standing alone in the entire medical record, this certainly is not substantial evidence providing an adequate basis for rejecting the medical opinion of Scanlon's treating physician, reinforced by the report of the Secretary's other examining physicians. Dr. Bagner did not opine that Scanlon was not disabled. Dr. Bagner also never attempted to make a determination concerning the disabling effect of Scanlon's pain, although he recognized the pain, nor did he suggest to the ALJ how the diminution in Scanlon's range of physical mobility, which he also recognized, should affect his ability to work. Dr. Bagner never even filled out a residual functional capacity assessment form, as is normally done by the Secretary's doctor in this type of case, which would have facilitated a comparison of the various doctors' opinions on the ex-

tent to which Scanlon's pain and diminished range of motion, noted by all the examining physicians, rendered him unable to work. Absent some sort of definite opinion or objective statement contrary to Dr. Nailor's findings, the ALJ did not, in this case, have sufficient evidence to reject the treating physician's opinion concerning the disabling effect of Scanlon's back injury.

 Nor can the ALJ's own observations be used as a substitute for informed medical judgment and the claimant's subjective testimony about the pain he suffers. While the evaluation of credibility is almost always left to the trier of fact, here the ALJ rejected Scanlon's complaints of severe pain by distorting the evidence and relying on factors wholly extraneous to the determination at hand. In finding Scanlon's presentation not credible, the ALJ stated:

> The report from Jacobi Hospital was received in evidence. It revealed that the claimant did not sustain a fractured ankle. He only had an ankle sprain. Thus, this report contradicts the claimant's testimony in this respect. Because of *this* contradiction I would not credit the testimony of the claimant concerning the extent and severity of his back pain. I conclude that since he exaggerated concerning the extent of his problem with his ankle, he exaggerated concerning the extent of the severity of his back problem. Because he exaggerated in his testimony as noted above, of his back problem, I further conclude that he feigned back discomfort during the hearing.

Tr. 15 (emphasis added). Thus, the ALJ totally discredited Scanlon's testimony by pyramiding a single purported contradiction in his testimony into a basis for discounting everything. To begin with, the contradiction found to exist by the ALJ is less than clear. Scanlon testified that he had a fractured ankle (Tr. 38). The report from Jacobi Hospital indicates that the ankle was sprained and dislocated (Tr. 148). The ankle was placed in a plastic soft cast (Tr. 38). The distinction, at least to a lay

person, between dislocation and fracture to an ankle which is placed in a cast is not so significant. Moreover, even the ALJ felt the ankle problem was "just ... incidental" (Tr. 48). Thus, in determining that the claimant exaggerated (lied?) about his ankle problem, the ALJ distorted the evidence somewhat.

More importantly, in pyramiding this exaggeration on an incidental issue into a basis for discrediting claimant's testimony and demeanor on the key matters at hand, the ALJ totally disregarded the limits imposed on his ability to reject subjective testimony of pain when the medical evidence submitted in the case unanimously concurs that pain was observed. All the doctors that examined Scanlon observed that movement caused him pain. Indeed, one of the Secretary's own consultative doctors diagnosed Scanlon's problem as "[m]oderate *to severe* chronic low back pain syndrome with consistent evidence for [sic] a clinical impairment" (Tr. 96) (emphasis added).

 The ALJ's discrediting of Scanlon's testimony regarding his pain in the face of substantial expert medical evidence that pain existed was impermissible. *See Rivera,* 717 F.2d at 724 (although it is permissible for ALJ to evaluate credibility of complaints of pain, he must do so in light of *all* evidence regarding extent of pain; where there exists substantial evidence to rebut ALJ's conclusion, ALJ's observations at hearing are entitled to limited weight, and his principal, if not sole, reliance on them is improper).

When the medical evidence is viewed along with Scanlon's testimony concerning the nature of his job as a police officer, it is clear that Scanlon has met his burden of demonstrating that he is unable to return to his prior employment. Indeed, he has been retired from that employment on a finding by the Medical Board Police Pension Fund that a permanent partial disability exists (Tr. 131). Moreover, each of the Disability Examiners that denied Scanlon's application prior to the hearing before the

ALJ determined that he could not return to his prior work (Tr. 54–56, 60–64).

As discussed above, once the claimant has sustained his burden of demonstrating that he is unable to return to his prior employment, the burden shifts to the Secretary to show that there exists substantial gainful employment in the economy which Scanlon could perform. *See Berry,* 675 F.2d 464; *Parker,* 626 F.2d at 231. The ALJ, however, did not, at least apparently, follow this approach. The ALJ indicated that he was "not convinced that [Scanlon's] medical problems prevent the performance of basic work activity," and so found that Scanlon "does not have any impairment or impairments which significantly limit the ability to perform basic work-related functions" (Tr. 16). Thus, the ALJ apparently found that Scanlon had not satisfied his burden on the second step and rejected his application. That is not substantiated by the evidence. Rather, Scanlon sustained his burden on the fourth step—to wit, his inability to return to prior work. The Secretary introduced no evidence to show that substantial gainful employment is available to Scanlon that he can perform considering his physical capacity, age, education, experience, and training. Since the Secretary introduced no evidence on this point, the Secretary's decision must be reversed and the matter remanded for further proceedings. Obviously, in reviewing Scanlon's claim on remand, the Secretary should obtain whatever additional medical evidence is necessary to update claimant's condition, especially since that condition appears to be a degenerating one.

In sum, the decision of the Secretary is REVERSED and the action REMANDED for further proceedings. This action is accordingly DISMISSED, subject to reopening, should plaintiff seek to appeal the Secretary's decision on remand.

SO ORDERED.