**Andrew McKENNA, Plaintiff,**

v.

**Shirley S. CHATER, Commissioner of Social Security, Defendant.**

**No. 94 CV 4495.**

United States District Court, E.D. New York.

July 7, 1995.

164

Meltzer Fishman Madigan & Campbell (Stanley F. Meltzer, of counsel), New York City, for plaintiff.

Zachary W. Carter, U.S. Atty., E.D. of New York (Michelle T. Weiner, of counsel), Brooklyn, NY, for defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge:

Plaintiff brought this action challenging the final decision of the Commissioner of Social Services (the Commissioner) denying his application for disability insurance benefits under the Social Security Act (the Act).

Both parties move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

### I

Plaintiff, born on April 23, 1959, has had, despite his relatively young age, a lengthy employment history. As soon as he completed high school he started to work. He was employed first as a supermarket clerk from 1976 to 1982, then as a police officer from 1982 to 1984, and finally as a firefighter from 1984 to 1991. He also worked a second job from 1988 to 1991, as a self-employed butcher.

Plaintiff says he has been disabled since October 3, 1991. Various physicians have diagnosed him as having several physically and mentally disabling conditions, including a herniated disc, degenerative disc disease, shoulder impingement, and depression.

The Social Security Administration (the Administration) denied plaintiff's December 15, 1992 application for benefits both initially and upon reconsideration. After a hearing on November 22, 1993 an Administrative Law Judge (the ALJ), Jonathan Jacobs, found him not disabled in what may, charitably, be described as a cursory decision.

Upon plaintiff's request for review the Appeals Council (the Council) on March 24, 1994 vacated the ALJ's decision and remanded the case to "an" Administrative Law Judge. The Council's order provided as follows.

The Appeals Council grants the request for review under the substantial evidence provision of the Social Security Administration regulations (20 CFR 404.970). Under the authority of 20 CFR 404.977, the Appeals Council vacates the hearing decision and remands this case to an Administrative Law Judge for resolution of the following issue:

The hearing decision indicates, page 3, last paragraph and Finding No. 4, that the claimant's subjective complaints of pain are not credible but does not address the following factors: prior work record; daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medication; treatment other than medication; other measures used to relieve symptoms; and the possibility of a medically determinable mental impairment. Although the decision cites and quotes parts of Social Security Ruling 88–13 and summarizes the claimant's allegations made at the hearing, there is no articulation of the specific medical findings and physicians' opinions, the claimant's reports of daily activities and symptoms to various physicians and other officials, and the other relevant factors noted above which contradict the claimant's testimony of subjective disabling pain and limitations (Exhibits 8, 12, 16, (pages 4 and 5), 18 and 19, among others).

Upon remand, the Administrative Law Judge will:

Further evaluate the claimant's subjective complaints and provide rationale in accordance with the disability regulations pertaining to evaluation of symptoms (20 CFR 404.1529) and Social Security Ruling 88–13.

After a hearing on March 17, 1994 the ALJ made the following findings on June 20, 1994.

1. The claimant met the disability insured status requirements of the Act on October 3, 1991.

2. The claimant has not engaged in substantial gainful activity since October 3, 1991.

3. The medical evidence establishes that the claimant has severe cervical herniation with impingement, mild depression, posttraumatic stress disorder and pain, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's subjective complaints of pain were considered exaggerated and not supported by the medical evidence or his description of his daily activities.

5. The claimant has the residual functional capacity to perform the physical exertion requirements except for prolonged standing and walking or lifting and carrying over ten pounds.

6. The claimant is unable to perform his past relevant work as a firefighter.

7. The claimant has the full residual functional capacity to perform the full range of sedentary work.

8. The claimant in 36 years old, which is defined as a younger individual.

9. The claimant has a high school education.

10. In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material.

11. Section 404.1569 of Regulations No. 4 and Rules 201.28, Table No. 1 of Appendix 2, Subpart P, Regulations No. 4, direct a conclusion that, considering the claimant's residual functional capacity, age, education, and work experience, he is not disabled.

12. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision.

The Council declined plaintiff's request for review on September 14, 1994. This action followed.

II

The relevant medical evidence may be summarized as follows.

On July 4, 1990 plaintiff was admitted to St. Vincent's Medical Center after a falling beam struck him on the back of the neck as he fought a fire. X-rays and computed tomography (CAT) scans showed no evidence of fractures, dislocations, or other abnormalities. Plaintiff was released on July 8, 1990 and prescribed Motrin and Tylenol with Codeine to control his pain. He did not resume work.

Dr. Michael Lavyne, a neurosurgeon at the New York Hospital and an associate professor at Cornell Medical School, examined

plaintiff on July 30, 1990 and diagnosed bilateral brachial plexopathy with injury to the right long-thoracic nerve, to be treated with "time and analgesics." He recommended that plaintiff "be followed by a neurologist" and that an electromyogram (EMG) be performed "to better delineate the extent of the brachial plexopathy." The doctor stated: "He remains one hundred percent disabled from work."

After examinations on August 6 and 29, 1990 Dr. Michael Schuman, a neurologist, reported that plaintiff complained of neck pain radiating to the right shoulder. He noted no indication of spinal cord compromise but stated that plaintiff would "need further investigation with EMG and evoked potentials of both arms as well as an MRI [magnetic resonance imaging] of the cervical region." He opined that plaintiff "is totally disabled from work at this time."

An EMG performed on August 10, 1990 indicated normal evoked response latencies and interwave latencies in the nerves tested but showed some neuropathic changes in certain innervated cervical paraspinal muscles. An August 19, 1990 MRI indicated spondylosis (degenerative joint disease) of the C3–4 and C4–5 intervertebral discs as well as "bulging discs associated with mild cord deformity."

Sometime in September 1990 plaintiff returned to work at the New York City Fire Department (the Fire Department) but was restricted to "light duty." Plaintiff also began chiropractic treatment around that time. Dr. Schuman saw plaintiff on October 1, 1990 and reported that he had advised plaintiff not to carry out his usual work, that "I still consider him disabled," and that "the only work he could do at present is clerical work seated at a desk."

The Fire Department granted plaintiff medical leave after he suffered an acute neck spasm on October 17, 1990.

After examining plaintiff on October 18, 1990 Dr. Schuman reported that while plaintiff had been on "light duty" at the Fire Department he was "doing poorly" with increased pain in his neck and both shoulders and also had experienced occasional arm spasms. Dr. Schuman recommended that plaintiff pursue a course of physical therapy and discontinue chiropractic treatment.

Dr. Peter Marchisello, a Fire Department orthopedist, examined plaintiff on October 21, 1990. He stated that plaintiff reported continuous pain in his neck and shoulder blades with periodic severe spasms and a severe headache on moving the neck. The doctor recommended that plaintiff wear a cervical collar, receive physical therapy twice a week, and remain on medical leave at least until his next examination. Dr. Marchisello prescribed Darvocet and Motrin to relieve pain on physical therapy.

Plaintiff returned to Dr. Marchisello on November 8 and 29, 1990 and described symptoms including pain in both shoulders radiating to the neck, shoulder and neck spasms, numbness in the torso, and chronic headaches. Plaintiff believed that the tissue of his left shoulder might be damaged.

Dr. Marchisello observed that plaintiff could walk and stand in a normal posture and carry the shoulder girdle through a full range of movement without restriction. He prescribed Flexeril to control the spasms and opined that plaintiff was "eligible for light duty" and should not climb stairs, lift, chauffeur, or perform messenger or inspection duties. Although no evidence indicated tissue damage of the left shoulder, Dr. Marchisello suggested an MRI and an x-ray "for the patient's peace of mind."

In a report dated December 6, 1990 a Dr. Rosenberg related that x-rays of plaintiff's cervical spine and shoulders showed a slight narrowing of the third vertebral interspace but no other abnormalities. An MRI of plaintiff's left shoulder performed on December 5, 1990 showed degenerative changes or tendonitis in the rotator cuff. An MRI of plaintiff's right shoulder performed on December 10, 1990 was normal.

Dr. Schuman saw plaintiff on December 12, 1990 and recounted that plaintiff had "not appreciably improved" despite having undergone physical therapy since October 1990. He suggested that physical therapy be tapered "as maximum benefits may well have been achieved."

An MRI of plaintiff's cervical spine performed on December 17, 1990 indicated a herniated disc centrally and anterolaterally to the right of midline at C3–4 with mild focal spinal cord compression.

After examining plaintiff on December 20, 1990 Dr. Marchisello reported "essentially no change" in plaintiff's condition. Dr. Marchisello observed that plaintiff could "fully flex," had a "good extension" of his cervical spine, and did not exhibit any signs of atrophy. He diagnosed cervical spondylosis and tendonitis of the left shoulder and stated that plaintiff could resume "light duty" work.

Dr. Luga Podesta, an orthopedist, examined plaintiff on January 3, 1991 and observed that plaintiff's left trapezius muscle was tender upon palpation. He diagnosed a cervical herniated nucleus pulposis as well as a possible cervical radiculopathy (nerve root disease) and rotator cuff strain, prescribed Celestone, Xylocaine and Indocin SR, and recommended that plaintiff take a medical leave for four weeks. He opined that plaintiff was "unable to work in any capacity" and should not return to work until reexamined on January 31, 1991.

Dr. Marchisello saw plaintiff on January 7, 1991. Plaintiff complained of neck, shoulder and low back pain and chronic headaches. Dr. Marchisello noted that plaintiff could, with pain, flex and rotate his cervical spine and bend over and touch his ankles. Dr. Marchisello could not palpate any spasm in plaintiff's shoulder or cervical spine. Upon Dr. Podesta's suggestion, Dr. Marchisello directed that plaintiff take a medical leave until he could be re-examined by Dr. Podesta.

Dr. Schuman examined plaintiff for the last time on January 25, 1991. He stated that plaintiff continued to have neck pain on the left side and that in his opinion, further physical therapy would not be beneficial. Plaintiff declined his suggestion of a consultation with a neurosurgeon. Dr. Schuman again reported that plaintiff could not carry out the work of a firefighter and that he should be retrained for other types of work.

On January 31, 1990 plaintiff returned to Dr. Podesta, who noted that plaintiff continued to complain of neck and shoulder pain

and of daily headaches and lacked 25% of extension and 50% of side bending and rotation, all with pain. He detected impingement syndrome of the shoulder in addition to his previous diagnoses, opined that plaintiff could "not continue his work with the N.Y.C. Fire Dept. at the present time and possibly in the future," and that plaintiff "may not return to work in any capacity until he is evaluated by neurosurgeons."

Dr. Marchisello saw plaintiff on February 6 and 16, 1991 and observed that plaintiff was restricted in moving his cervical spine and in elevating his shoulders. He authorized consultations with orthopedic and neurosurgeons.

Dr. Marchisello referred plaintiff to Dr. Thomas Errico, an orthopedic surgeon and an associate professor of orthopedic surgery at New York University School of Medicine. He examined plaintiff on February 20, 1991 and noted that plaintiff had pain in range of motion of his neck and was severely restricted on side bending to the left "by a lot of pain." Attempts at hyperextension of plaintiff's neck caused pain radiating to the occipital region.

Dr. Errico diagnosed a cervical plexopathy secondary to trauma and a cervical hyperextension injury. He stated that "the disc herniation at C3–4 does not fit with his pain pattern" because the herniation "is more to the right, and his pain is almost entirely left-sided." He opined that plaintiff was not a candidate for cervical disc surgery and that such surgery would not "help his pain pattern significantly."

Dr. Marchisello referred plaintiff again to Dr. Lavyne, who again examined plaintiff on February 25, 1991 at the Division of Neurosurgery of the New York Hospital–Cornell Medical Center. He noted that plaintiff experienced persistent pain in his left shoulder, and that although plaintiff had a full range of motion of his cervical spine, he felt pain on lateral bending, especially on the right and with extension.

Dr. Lavyne detected a C3–4 herniated disc that he opined was related to plaintiff's neck pain. This herniation was not "apparent" to the doctor on the examination of July 30,

1990. He suggested that surgery might be necessary in the future if plaintiff developed motor or sensory deficits related to the herniated disc and progressive cervical spondylosis with cord compression. He stated that plaintiff "remains 100% disabled from work as a result of this disc herniation."

Dr. Marchisello saw plaintiff two more times, on March 7 and April 10, 1991. Plaintiff continued to complain of severe neck pain. On March 7, the doctor said "apparently" plaintiff was "not able to perform any form of light duty" and had been advised by Dr. Errico or Dr. Lavyne that his neck would not improve. The doctor concluded that he doubted that light duty was "a real possibility" and that review of plaintiff's condition by a "Three Man Board" was "essential." On April 10, Dr. Marchisello opined that plaintiff was "eligible" to light duty work. He so recommended to the Fire Department's Medical Board which was to evaluate plaintiff's condition.

On April 11, 1991 a committee of the Department's Medical Board (the Committee) voted that plaintiff was unfit for fire duty due to a herniated disc and cervical spondylosis. The Committee recommended that plaintiff resume light duty.

On September 10, 1991 Dr. Richard Raynor, a neurosurgeon, examined plaintiff on behalf of the Fire Department. An MRI showed some progression of the previously detected mild degenerative changes and herniated disc at C3–4 resulting in "significant central spinal stenosis and mild compression of the spinal cord." An EMG was normal.

On October 23, 1991 the Committee once again determined that plaintiff was "disabled from full fire duty due to his cervical pathology." The Committee recommended that plaintiff receive an accident disability retirement, and added that "he may engage in a suitable occupation."

Plaintiff did not see a physician again until September 29 and October 27, 1992, when he was examined by Dr. William Head, Jr., a psychiatrist and neurologist. He was the first doctor who treated plaintiff who was not employed or retained by the Fire Department. The doctor submitted a full and detailed report of sixteen single spaced pages, including a detailed description of all the medical records relating to plaintiff's injury and treatment.

At the September 29, 1992 examination plaintiff complained of nervousness, insomnia, and frustration and depression resulting from his physical limitations. Dr. Head observed that plaintiff was preoccupied with his physical problems, that his mood and affect were depressed, and that he tended to view his situation as hopeless and overwhelming. The doctor diagnosed "at least a moderately severe depression."

At the October 27, 1992 examination plaintiff complained of constant headaches, chronic neck and shoulder pain radiating into his arms and head, arm and shoulder spasms, and dizziness. Dr. Head noted that plaintiff's stance and gait were normal and that his range of cervical motion was 80% of normal on flexion and extension and 50% of normal on lateral rotation and flexion. After reviewing plaintiff's medical records, including reports on the August 19, 1990 and December 5, 12 and 18, 1990 MRI tests, Dr. Head diagnosed a herniated disc at C3–4, degenerative disc disease, impingement syndrome of the shoulder, bilateral brachial plexopathy, lumbar strain and cephalalgia (headache). He opined that plaintiff was "permanently disabled from his job as a firefighter, and for that matter, all work activity" and that plaintiff's neurological conditions met federal disability listings.

Dr. Robert Simon, an orthopedist of Diagnostic Health Services, Inc., examined plaintiff on February 23, 1993 on behalf of defendant. The doctor submitted a summary report of a page and a half. Defendant did not see fit to furnish him with either the films or the reports of the MRI or CAT examinations.

Plaintiff reported constant pain and stiffness in his neck and said that although he could not sit for longer than an hour without becoming dizzy, he could stand and walk for prolonged periods without significant difficulty.

Dr. Simon said he observed that plaintiff walked normally and could maintain a seated position with no apparent distress. The

range of motion of his cervical spine was 20 degrees flexion, 10 degrees extension, 30 degrees right rotation and 30 degrees left rotation. An X-ray of his cervical spine showed "well maintained" intervertebral disc spaces. Dr. Simon opined that although plaintiff suffered from chronic neck pain secondary to herniated nucleus pulposis, he could stand and walk at least six hours of an eight hour day and lift at least ten pounds frequently.

The record does not reveal how long Dr. Simon's examination took.

Dr. Carlo Filiaci, a consultative psychiatric examiner for defendant also with Diagnostic Health Services, Inc., saw plaintiff on February 27, 1993. Plaintiff said he felt depressed and overwhelmed by financial problems. He reported using medications including Prozac, Darvocet and Norflex.

Dr. Filiaci noted that plaintiff's mood was moderately to severely depressed. He concluded that plaintiff could nonetheless function in a work setting.

Soon thereafter plaintiff began seeing his current treating physician, Dr. Lourdes P. Esteban, a neurologist. She examined him first on May 7, 1993. Plaintiff complained of neck pain radiating to his right shoulder, numbness in his right arm, neck spasms, headaches, and dizziness. He said that he had been "dropping things from his right hand." The doctor's impression was cervical sprain and radiculopathy. She referred him to Dr. Richard S. Pinto for an MRI examination.

On May 24, 1993 Dr. Pinto reported "disc protrusion and osteophytic ridge noted anterolaterally to the left at C3–4 producing a mild degree of focal and spinal cord compression to the right of midline."

Dr. Esteban saw plaintiff again on June 17, 1993 and noted the findings of the MRI. She again diagnosed cervical myofascial sprain and radiculopathy, and recommended that plaintiff continue using Prozac, Darvocet and Ibuprofen.

On a form entitled "Medical Assessment of Ability to Do Work Related Activities (Physical)" and dated November 19, 1993 Dr. Esteban stated that an MRI of the cervical spine showed disc protrusion and osteophytic ridge at C3–4 with spinal cord compression and that plaintiff experienced "continuous spasm and tenderness of paracervical muscles with decreased sensation of left neck and upper arm." She opined that these conditions and the "electric shock" plaintiff felt from quick neck movements prohibited him from climbing, stooping, kneeling, balancing or crawling, and from lifting or carrying more than five pounds, but did not affect his ability to stand, walk or sit.

Plaintiff testified at the November 22, 1993 hearing that he could not move his head, sleep, concentrate, or sit or stand for long periods because of chronic pain in his neck, shoulders and legs. He stated that he experienced frequent spasms and dropped things. He said that he wore a cervical collar, used medications including Prozac, Ibuprofen, Methocarbamo, Cyclobenzapr and Propoxphene, and could not sleep for longer than two or three hours, walk for more than two blocks, sit or stand for longer than approximately 15 minutes, or lift more than a pound.

Plaintiff testified that he could not help with household chores but could attend church services three or four times a year and travel to upstate New York (two hours by car each way) a couple of times a year.

Dr. Esteban saw plaintiff on January 6, 1994, after the first hearing and before the second. Plaintiff described symptoms including numbness of his right face, arm and hip, eye twitching, neck pain and stiffness, and insomnia caused by pain. Dr. Esteban observed a moderate amount of spasm, tenderness and limitation of motion of plaintiff's right paravertebral cervical and thoracolumbar region, as well as decreased sensation and minimal weakness of his right shoulder secondary to pain. She prescribed Flexeril, Relafen, Dalmane, Prozac and Darvocet. Her prognosis was that plaintiff's "permanent" condition disabled him from his job as a firefighter and "any other employment."

At the May 17, 1994 hearing plaintiff testified that he experienced neck and back spasms with greater frequency than he had the previous year. He described daily neck, back and shoulder pain and chronic severe headaches exacerbated by movement. He

stated that he used medications including Prozac, Flurazepam and painkillers and muscle relaxants and wore a cervical collar every day.

Plaintiff said that he felt pain if he walked more than a block, stood for longer than ten minutes or sat for longer than twenty minutes. He stated that lifting more than three or four pounds caused spasms.

Plaintiff testified that because of his condition he could not drive, dress himself without assistance, help with household chores, or read for more than a few minutes.

### III

■ Plaintiff says that the ALJ erred by (1) relying on the opinion of Dr. Simon, a consultative examiner, (2) not arranging for the testimony of a vocational expert and (3) utilizing the Appendix 2 grids. The court may overturn the Secretary's determination only when it is not supported by substantial evidence. 42 U.S.C. § 405(g).

Plaintiff says that the ALJ should not have relied on the opinion of Dr. Simon because (1) the Administration did not provide him with plaintiff's medical records, (2) his examination of plaintiff was cursory, and (3) the ALJ denied plaintiff an opportunity to cross-examine him.

The Administration will pay for a consultative examination in a situation, among others, where "a conflict, inconsistency, ambiguity or insufficiency in the evidence must be resolved." 20 C.F.R. § 404.1519a(b)(4). If such an examination is procured, the Administration gives the examiner "any necessary background information" about the claimant's condition, 20 C.F.R. § 404.1517, and the examiner is obliged to allow sufficient time to "take a case history and perform the examination, including any needed tests." 20 C.F.R. § 404.1519n.

In this case, the ALJ concluded that plaintiff was capable of the full range of sedentary work based largely upon Dr. Simon's skimpy report on February 23, 1993 that plaintiff's impairments caused "minimal physical restrictions."

But Dr. Head's report, based on a thorough review of plaintiff's medical records as well as an October 27, 1992 physical examination, stated that plaintiff was significantly restricted in his range of motion in the cervical region. Moreover, Dr. Esteban's reports from the same and following year indicated "spasm and tenderness of the paravertebral cervical and thoracolumbar regions" with "some limitation of motion" and "decreased sensation."

In addition, plaintiff repeatedly questioned whether Dr. Simon had received adequate information to evaluate plaintiff's condition, and requested an opportunity to cross-examine Dr. Simon.

The court determines that in these circumstances, the ALJ abused his discretion in failing to subpoena Dr. Simon to testify at the hearings. See Cruz v. Shalala, No. CV 93–5916, 1995 WL 302505 at *1 (E.D.N.Y. May 5, 1995). Because Dr. Simon did not indicate whether he received or reviewed plaintiff's medical records, including those of plaintiff's treating physician, Dr. Esteban, plaintiff's objections to the reliability of Dr. Simon's report were "sufficiently controversial to merit cross-examination." Fernandez v. Schweiker, 650 F.2d 5, 8 (2d Cir.1981), quoting McLaughlin v. Secretary of Health, Education and Welfare, 612 F.2d 701, 704 n. 2 (2d Cir.1980).

■ For the ALJ, without the advice of a medical witness, to dismiss the significance of the reports of the doctors finding plaintiff disabled and rely so heavily on the perfunctory report of Dr. Simon who did not even have the MRI and CAT records before him suggests that the ALJ unjustifiably transmogrified himself into a neurologist and psychiatrist.

All of plaintiff's doctors were retained by the Fire Department until Dr. Head. Yet some of those retained took plaintiff's injuries more seriously than the ALJ, who never even referred to their reports in his decision. This omission is disturbing not only because some of those reports conflicted with Dr. Simon's assessment, but also because they document plaintiff's consistent allegations of severe pain. The record does not depict a plaintiff who was a malingerer. He worked consistently from the date of his graduation

from high school, sometimes at two jobs. His descriptions of his subjective symptoms should not have been passed over so lightly. *See Rivera v. Schweiker,* 717 F.2d 719, 725 (2d Cir.1983).

The court concludes that the ALJ's decision is not supported by substantial evidence because plaintiff did not receive a fair and objective assessment of his case. The court need not now consider plaintiff's claims regarding the need for expert vocational testimony or misapplication of the Appendix 2 Grids.

### IV

The court will remand the case for further proceedings. When the Council after the first hearing vacated the ALJ's decision and pointed out its patent inadequacies, the Council remanded for a further hearing before "an" ALJ. This court now directs that the further proceedings be held before a different ALJ.

In so directing the court need not accept the characterizations by plaintiff's counsel of the propensities of ALJ Jacobs. It is enough that he has been twice reversed, once by the Council and once by this court. The court has the power to require that the hearing be before a different ALJ without any intellectual commitment to a result. *See Kendrick v. Sullivan,* 784 F.Supp. 94, 103 (S.D.N.Y. 1992); *Spears v. Heckler,* 625 F.Supp. 208 (S.D.N.Y.1985).

The ALJ shall grant plaintiff's request to subpoena Dr. Simon to testify at the hearing.

### V

Case remanded for further proceedings consistent with this opinion.

So ordered.